## UNITED STATES v. SUTHERLAND et al.
### No. 2552.

District Court, W. D. Missouri, W. D.
Dec. 27, 1934.

Maurice M. Milligan, U. S. Dist. Atty., and Samuel Carmean, Asst. U. S. Dist. Atty., both of Kansas City, Mo., and A. W. De Birny, Regional Litigation Atty., of Chicago, Ill., for the United States.

I. N. Watson, Paul Barnett, Elton L. Marshall and Henry N. Ess, all of Kansas City, Mo., for defendants.

OTIS, District Judge.

The prime question for decision is whether the Congress has power to fix or to authorize executive officers to fix minimum prices below which a retail lumber dealer may not sell lumber products. It is restricted to the case of a dealer whose stock of lumber originated in states other than that in which his yard is located and who sells to some customers from other states who have come to his yard to purchase for cash and for delivery at the yard. The question arises in the manner now to be stated.

Section 3 of the National Industrial Recovery Act (15 U. S. C. § 703 [15 USCA § 703]) authorizes the President to approve codes of fair competition for trades and industries, makes the provisions of any code so approved standards of fair competition for the trade or industry involved, and vests the District Courts of the United States with jurisdiction to restrain any code violation in any transaction in or affecting interstate or foreign commerce. Pursuant to this act, the President, on October 3, 1933, approved a code for the retail lumber trade. One of its provisions is that "no person shall sell lumber, lumber products, building materials or building specialties * * * below cost."

This provision of the code has been interpreted in its administration as meaning that no person shall sell lumber, etc., below minimum prices fixed by code authorities.

Defendants are owners of retail lumber yards in Nebraska, Iowa, Missouri, and Oklahoma, each of which is operated on the "cash and carry" plan. In each yard lumber and lumber products are displayed for sale. Customers select what they desire to buy, pay cash for their purchases, and carry them away. The stock in each yard is made up of lumber and lumber products which the defendants have purchased and had shipped to their yards, generally speaking, from states other than those in which their yards are located, have placed in their yards, and displayed for sale. Defendants at any of their yards sell and deliver at the yards lumber and lumber products to any customer who pays their price in cash without regard to the customer's place of residence or to his intention as to where he will take or use his purchase. Such is and was the general plan and nature of the defendants' business.

Conceiving and being advised by counsel that with a business of the plan and nature just described they had the lawful right to sell their own merchandise at prices fixed by themselves rather than at prices fixed for them by executive officers of the federal government, the defendants did exactly that. For example, on February 23, 1934, at one of their yards, the defendants sold four bundles of shingles to J. A. Willse for $4.25, when the minimum price fixed was $5.20. Again, at one of their yards, on March 5, 1934, the defendants sold a bunch of shingles to Percy Bishop for $1.80, when the minimum price fixed was $3.10. On the same day the defendants sold two bundles of shingles to Harry C. Davis for $2.13, when the minimum price fixed was $2.60.

Defendants' competitors complained. They demanded that the defendants be criminally prosecuted or enjoined from further selling their own lumber at their own prices. The government moved. A bill in equity was filed in this court. A temporary restraining order without notice to the defendants was asked and denied. Now the matter is here on the government's application for a temporary injunction. While other violations of the code are charged than that of price cutting, it is so doubtful, from the affidavits filed, that the defendants are guilty of them and so clear from them that the government's real case consists in the price-cutting charge that that alone will be considered.

While the prime question for decision is that stated in the first sentence of this opinion two preliminary matters must be considered before that question is reached. The first is this: Did Congress purport to authorize price fixing? And the second: If Congress did authorize price fixing, were the prices below which the defendants are charged with selling fixed pursuant to that authorization or outside of it?

## Price Fixing Not Expressly Authorized by Congress.

1. The statute certainly does not expressly authorize the President or any other to fix retail lumber or any prices. It does authorize the President to approve for certain industries codes of fair competition and gives to the approved codes the force of law. If a price-fixing code is not a code of fair competition, then it is not one which the statute authorizes.

To call a set of regulations a code of fair competition does not make it one. Any given set of regulations, if challenged, or any regulation in the set, if challenged, must be tested to determine whether it has any possible relationship to the subject of fair competition.

The statute does not define the phrase "fair competition," but that phrase and the words in it are common and of well-understood significance. "Fair" competition is "open," "equitable," "just" competition. It is a competition which is "fair" as between competitors and as between any of them and his customers. But "fair" competition must still be "competition." The adjective does not destroy the noun. Competition is "the effort of two or more parties, acting independently, to secure the custom of a third party by the offer of the most favorable terms." Webster's New International Dictionary. To prohibit one of two who are dealing in the same commodity to offer that commodity at a lower price than the other offers it is not to effect fair competition, but is to destroy competition in its very essence.

Fair competition must be the opposite of unfair competition. "Unfair competition" many times has been judicially defined. "The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another." Howe Scale Co. v. Wyckoff, 198 U. S. 118, 140, 25 S. Ct. 609, 614, 49 L. Ed. 972; Hanover Co. v. Metcalf, 240 U. S. 403, 412, 36 S. Ct. 357, 60 L. Ed. 713. In the multitude of cases, federal and state, which have dealt

with the subject of unfair competition, it is doubtful if there can be found one in which the underselling by one of another, without any fraud or misrepresentation, was held to be unfair competition. If underselling is not unfair competition, it is fair competition. When Congress used that phrase, the presumption is it used it as the phrase generally is understood.

### Prices Fixed Here Unauthorized by Statute.

2. But whether it can be said that Congress did not intend to authorize price fixing to any extent whatever when expressly it only authorized approval of codes of fair competition, it certainly must be said that it did not authorize arbitrary price fixing. Any price fixing is inconsistent with the historic conception of competition, but, if that consideration be laid aside and if it be said that one who sells his own goods in competition with other vendors of like goods may be unfair to them when he undersells them, that conclusion must be reached through the application of some rational standard of fairness and not by the ipse dixit of an official. And the standard must be one that can be expressed in formula. If it is not one that can be so objectively perceived, then in no true sense is it a usable standard; at most it is no more than the whim of an individual.

In the statute enacted by Congress no standard for determining what is fair competition is provided. The standards already established in the law and any other rational standard were, therefore, available for use. In the code involved in this case the standard approved, so far as concerned the matter of prices, is this: "It is unfair competition for a dealer to sell lumber products below their cost to him, plus the cost of selling."

Let it be admitted arguendo that this is a rational and defensible standard. Although it is certainly on the very border line between sense and nonsense. For innumerable situations may be supposed in which a merchant would be justified in selling below cost and in which no just charge of unfairness could be laid against him. The line certainly would be crossed and all relation to competition lost if the standard adopted were this: "It is unfair competition for a dealer to sell lumber products below what they would have cost some real or hypothetical competitor to be selected by the code administrator, plus that competitor's cost of selling."

In the code here no such false and irrational standard was present. But the administrator of this code usurped authority, first, to substitute for the standard provided in the code a standard not provided and which was false and irrational; and, second, to attempt to enforce the substituted standard. These defendants are not charged with selling below their costs. They are charged with selling below certain hypothetical costs apparently arrived at by averaging many costs.

It is true that the code provides that the administrator shall prescribe the method of calculating costs. Obviously that power does not include authority to prescribe a method which necessarily and surely will produce something other than any dealer's actual costs.

It is true also that the administrator of this code, after adopting a false and irrational method for determining any dealer's "actual costs," officially decreed that the dealer's actual costs shall be not less than the hypothetical costs so arrived at. Mediæval alchemy scarcely could have wrought so marvelous a transmutation.

### The Commerce Clause and Price Fixing.

3. Laying to one side the conclusions just stated, we come now to the greater question touching the power of Congress under the Constitution either to fix prices below which goods may not be sold or to authorize the executive branch of the national government to do that. We are concerned with that question, of course, only in so far as it is relevant to this case and as it affects the defendants.

The only suggested source of such power is clause 3 of section 8 of the first article of the Constitution: "The Congress shall have Power * * * To regulate Commerce * * * among the several States. * * *" There is no pretense that the national government has any such general price fixing power as the several states possess over businesses affected with a public interest.

The only power of Congress under this clause is to "regulate Commerce * * * among the several States." Congress derives from the clause no power whatever to regulate anything unless it is commerce among the states or is so directly connected with it as that its regulation is necessary either to save from negation some affirmative regulation or to keep commerce free and unburdened.

Are the sales made by defendants at their lumber yards commerce among the states?

### Defendants' Transactions Not Interstate Commerce.

The contention is made by the plaintiff that defendants' sales at their yards are trans-

actions in interstate commerce because the things sold are imported by the defendants to their yards from other states and because also they are sold to some who may remove the things purchased to other states. The contention seems to me so extravagant as scarcely to deserve serious consideration.

If the sale of a bunch of shingles in defendants' lumber yard at Tulsa to a purchaser for cash at that lumber yard is a transaction in interstate commerce solely because the shingles were imported by the defendants from the state of Oregon, then the sale of a sack of flour by a grocer to the housewife who calls at his store is a transaction in interstate commerce if the flour was bought by the grocer, as usually is the case, from a wholesaler or miller in another state. Under such a theory, almost every sale made by any merchant in every city, town, and hamlet in the United States is a transaction in interstate commerce. The theory is supported neither by reason nor precedent.

Again, if the sale by defendants of a bunch of shingles in one of their yards is a transaction in interstate commerce because the purchaser may carry the shingles bought by him to another state, then every sale made by any merchant to a nonresident of the state is a transaction in interstate commerce. Then the Missouri farmer who has a stand on the highway where he offers for sale the products of his farm to passing travelers, if he sells to one whose motorcar has an Iowa license, is engaged in interstate commerce, and Congress may regulate his business even to the extent of prescribing the prices he shall charge.

When a merchant, whether he be a lumber merchant or some other kind of merchant, has imported from other states goods to be sold at his place of business, he has indeed engaged in interstate commerce, but the interstate commerce has ended when he has placed in his stock of goods and on display the things he has imported. His transactions thereafter with customers at his store are intrastate, not interstate. When a lumber merchant or any other type of merchant or one not a merchant sells a thing in the state of Missouri to a resident of Missouri, that transaction certainly is altogether intrastate. If the person to whom he sells is a resident of Iowa and will take the thing purchased to Iowa, the transaction between the vendor and vendee still is altogether intrastate. The transaction is completed when the sale is made. What the purchaser does with the thing bought certainly cannot affect the nature of the transaction between him and the seller. The purchaser indeed is engaged in interstate commerce if he transports the thing bought to another state, but the seller is not. It is impossible to elaborate a truth so simple.

The Supreme Court long since has decided that interstate commerce ends when goods imported from another state have been brought to rest and are offered for sale. Brown v. Houston, 114 U. S. 622, 5 S. Ct. 1091, 29 L. Ed. 257; Public Utilities Commission v. Landon, 249 U. S. 236, 245, 39 S. Ct. 268, 63 L. Ed. 577. And the Supreme Court long since has decided that interstate commerce has not yet come into existence until the final movement of the things alleged to be in interstate commerce has begun. Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715.

Learned counsel for plaintiff have sought to wrench some support for their extraordinary contention out of the opinion of the Supreme Court in State of Minnesota v. Blasius, 290 U. S. 1, 54 S. Ct. 34, 36, 78 L. Ed. 131, but that opinion is of no value to them.

In Minnesota v. Blasius one of the questions for decision was whether cattle owned and being held in possession by a trader in live stock at the St. Paul Union Stock Yards, who had purchased the cattle from shippers from other states for resale to purchasers chiefly also from other states, were in the course of interstate commerce while yet owned and held in possession by him in the yards at St. Paul. The court held that the cattle were still in the course of interstate commerce under the facts of that case. Interstate commerce, said the court, "is not a technical legal conception, but a practical one, drawn from the course of business." Quoting from its earlier opinion in Swift & Co. v. United States, 196 U. S. 375, 398, 25 S. Ct. 276, 49 L. Ed. 518, the court said: "When cattle are sent for sale from a place in one state, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the purchase of the cattle is a part and incident of such commerce."

The inapplicability of Minnesota v. Blasius to the case here is clear. The cattle involved in the Blasius Case were still in interstate commerce because their ownership and possession by Blasius were only a tem-

porary interruption in the current of commerce among the states. It was typical of the business of Blasius that the cattle he purchased from vendors in other states would immediately be sold to vendees in still other states. The interstate commerce had not come to an end with the purchase and possession of Blasius, but only was temporarily halted thereby. The Supreme Court pointedly observed that Blasius had not bought the cattle involved for slaughter in St. Paul. If he had done so, if the cattle had been purchased by him on the market in St. Paul and then sold by him to a local packer in St. Paul for slaughter, and if that had been typical of his business, the court certainly would not have ruled that sale of such of the cattle was a transaction in interstate commerce.

The argument made that the only distinction between the Blasius Case and this case is that Blasius held the cattle bought by him only during a brief period, whereas the defendants may hold the lumber bought by them for a longer period, has no merit. The real distinction is that in the Blasius Case the interruption in the current of interstate commerce was so slight that it was the same current before and after Blasius came into the current, whereas in this case the current of interstate commerce comes to a full stop when the lumber products imported by the defendants have been deposited in the yards. The Blasius Case would have been comparable with this, if, when Blasius had purchased the cattle at the yards, he had removed them to his farm, held them there, perhaps for a rising market, and thereafter had offered them for sale to any purchaser tendering his price. It is certain, however, that in that situation Blasius would have found no lawyer to contend and no court to decide that his cattle were still in interstate commerce. It is one thing temporarily to halt on the very highway of commerce a commodity being transported from one state to another, the transportation continuing when the temporary suspension has ended. It is quite another and a distinct thing to remove a commodity from the highway of commerce, to deposit it in a warehouse for sale, and thereafter to sell it.

### Defendants' Transactions Do Not Affect Interstate Commerce.

But it is contended that defendants' transactions with their customers at least so directly affect commerce among the states as to be subject to regulation by Congress. Whether that is true is a question which, it seems to me, also must be answered in the negative.

How can sales of lumber products by defendants at prices lower than competitors charge for the same products affect interstate commerce?

The argument is that, if there are two lumber yards in the town of X, one owned by A and one by B, if A sells shingles which he has imported from Oregon for $1 a bunch, whereas B can sell them only at $1.50 a bunch, A will have all the business and B will have none. Since B has no business, he will not import shingles from Oregon. All the shingles in the town of X will be imported by A. The volume of interstate commerce in shingles so far as the town of X is concerned will not be decreased, but the interstate commerce which B otherwise would carry on will be lessened and perhaps destroyed. So A's sales at low prices affect interstate commerce by lessening B's participation in that commerce.

Does the power of Congress to regulate that which affects interstate commerce go so far as to include anything affecting interstate commerce in a manner so fanciful? If it is that comprehensive, it reaches and includes almost every conceivable human action.

If the farmers of Kansas raise wheat, they will be able to supply the local demand for wheat in Kansas, and it will not be necessary to import wheat into Kansas. So the farmers of Kansas have affected interstate commerce by raising wheat! Is Congress, therefore, empowered to regulate the production of wheat by farmers in Kansas, to make rules as to how much wheat they shall plant, what shall be paid by them to their hired men, at what price they may sell the wheat which they produce?

There are great forests in Oregon. Lumber products are manufactured in that state and can be sold there more cheaply than in those states in which there are no raw materials for the manufacture of such products. If there were no forests in Oregon, the people of Oregon would be compelled to import lumber products from other states. The fact that there are forests in Oregon, and that lumber products can be manufactured and sold there more cheaply than imported lumber products can be sold, lessens and perhaps even altogether prevents interstate commerce in lumber products into Oregon from other states. Can Congress regulate the business of manufacturing and selling lumber in Oregon because that business affects interstate commerce in the way suggested?

No one seriously will make such contentions. Even if Congress may regulate all

that directly affects interstate commerce, the sale of a bunch of shingles by a retail lumber merchant, although that means that his competitor will import one bunch of shingles less than otherwise he would import, the sale of a bushel of wheat by a Kansas farmer, although that sale means that a bushel of wheat will not be imported into Kansas which otherwise might be imported, these are not acts which directly affect interstate commerce. At the very most they are but circumstances which influence individuals in determining whether they will engage in interstate commerce.[1]

No Power in Congress to Fix Prices.

4. The business of defendants, so far as it is involved here, neither is interstate commerce, nor does it directly affect such commerce. If, however, each of these conclusions is rejected, the question still remains: Under the commerce clause does Congress have the power to fix prices of things sold in interstate commerce or in transactions which do directly affect such commerce?

If the first subdivision of this question is answered in the negative, the second subdivision necessarily will be so answered. Only the first, therefore, need be considered.

If the power to regulate commerce among the states includes the power to fix the prices at which things are sold in such commerce, then that power, like every other vested in Congress, is limited only by the discretion of Congress, unless limited by some other constitutional provision.

Shall the commerce clause then be interpreted as if it read: "The Congress shall have power to regulate commerce among the several states, including the power to fix prices at which persons may sell in such commerce their property?"

If an overheated imagination can suppose that the Convention would have dared to write such a commerce clause as that, it requires no imagination whatever to conclude that the Constitution with such a clause unanimously would have been rejected by the states. Too recently the people of the United States had suffered from what they regarded as tyranny to be led into the voluntary creation of a tyranny infinitely more absolute. In the commerce clause which was written and adopted they sought protection of individual liberty of trade and all its incidents, protection from the then stifling and conflicting commercial regulations of the several states. They certainly did not intend to make possible an interference with individual liberty more restricting than any the most meddling of the states ever dreamed of.

The suggested interpretations of the commerce clause do violence to its essential purpose and ignore its background.

But as new wine may be put into old bottles despite the ancient warning, so new interpretations of constitutional provisions sometimes may be maintained, if the language used in them will support at all the new interpretations. The possible significance of a provision of the Constitution is not limited to its original purpose. It is not enough, therefore, to say that the suggested interpretation of the commerce clause never was intended by the fathers.

It is enough to say that the price at which an owner offers to sell his property and the price a prospective purchaser agrees to pay in no sense whatever are incidents of commerce among the states. The meeting of the minds of vendor and vendee in an agreement as to price precedes any movement of the property sold and bought. Since the contract between the parties is no part of that

---

[1] In this connection some reliance is placed by plaintiff's counsel on the decision and opinion of the Supreme Court in Local 167 v. United States, 291 U. S. 293, 54 S. Ct. 396, 398, 78 L. Ed. 804. It was there ruled that a conspiracy among numerous marketmen in New York City to control the prices at which poultry, which had come to that city in interstate commerce, should be sold at retail, was a violation of the Sherman Anti-Trust Act (sections 1, 2 [15 USCA §§ 1, 2]). The court said: "The control of the handling, the sales and the prices at the place of origin before the interstate journey begins or in the state of destination where the interstate movement ends may operate directly to restrain and monopolize interstate commerce." But this thoroughly sound doctrine, not only does not support counsel's contention, but militates against it. The very reason why the control of prices by some directly burdens interstate commerce is that it prevents others from selling freely and at their own prices what has been shipped to them in interstate commerce. That, under the commerce clause, Congress has the power to legislate against conspiracies in restraint of individual freedom of trade, and all its incidents certainly does not argue that Congress itself has the power to do the very thing condemned by such legislation.

commerce which Congress is given power to regulate, Congress cannot directly regulate the terms of the contract.

Can Congress accomplish the same end by indirection? Can it prohibit absolutely the movement in interstate commerce of things, harmless in themselves, unless they are sold at prices satisfactory to Congress? Is it true, as was said by the venerable and prophetic Holmes in Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 533, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, that, under its power to regulate interstate commerce, Congress, without rhyme or reason, "may prohibit any part of such commerce that Congress sees fit to forbid?" He said that in dissent from the majority of his brethren.

Until now at least the Supreme Court has declared that Congress has not quite such power. It cannot prohibit the movement in commerce of harmless things because, forsooth, they were manufactured by child labor, or by vegetarians, or by teetotalers, or on any ground not related either to the character of the things transported or to keeping free and open the highways of commerce for all lawful purposes. Fixing the price at which the citizen must sell his own property has no relation to either of these objects.

Plaintiff's application for a temporary injunction is denied.

It is so ordered.