10 F.Supp. 104 (1935)
UNITED STATES
v.
NATIONAL GARMENT CO. et al.
No. 11203.
District Court, E. D. Missouri, E. D.
March 9, 1935.
*105 Irwin Sale, Asst. U. S. Atty., of St. Louis, Mo., and James J. Caffrey, Asst. Atty., N. R. A. Division, Washington, D. C. (Harry C. Blanton, U. S. Atty., of Sikeston, Mo., on the brief), for the United States.
Victor Packman, of St. Louis, Mo., for defendants.
FARIS, Circuit Judge.
This is an action to restrain defendants from violating the Code of Fair Competition for the Underwear and Allied Products Manufacturing Industry, issued and promulgated September 18, 1933, and the several amendments thereto. Jurisdiction is bottomed on section 3 (c) of title 1, of the National Industrial Recovery Act of June 16, 1933 (48 Stat. 195, 196), 15 USCA § 703 (c), as also on the general jurisdiction in equity inherent in this court. It came on for hearing upon the bill of complaint; an order of this court to show cause why a temporary injunction should not issue against defendants, and the return of the defendants to said order. All such evidence as counsel, respectively, were advised to offer was heard, and the matter was submitted on briefs, which are before the court.
The evidence adduced tended to prove that defendant National Garment Company is a corporation organized and existing under the laws of the state of Missouri and domiciled as to its offices in the city of St. Louis, in said state; while defendant National Underwear Corporation is likewise a corporation, organized and existing under the laws of the state of Illinois, but domiciled in the city of St. Louis, wherein both its offices and its factory are located. The factory of the National Garment Company is located at the town of Chaffee, in the state of Missouri. Both companies have the same offices and officers and keep, in effect, the same set of books only differentiating, by an initial letter, the origin of the goods sold. Defendant National Garment Company owns 95 per cent. of the capital stock of the Underwear Corporation, while the remaining 5 per cent. is owned by the president of the Underwear Company (who is also president of the Garment Company) and a few others. Obviously, the Underwear Company is a subsidiary of the Garment Company of the most intimate sort.
Defendants buy their raw materials, largely knitted rayon, partly in Missouri, but largely in other states of the Union, and while they manufacture only in Missouri, they sell to jobbers only, both in Missouri and in other states, from which they receive orders. But as already said, for the major part, both their purchases of materials and sales of their products are from or in other states; although they are in competition with other manufacturers, who largely sell only in Missouri.
The factual complaint of plaintiff is bottomed on the alleged violation by defendants of sections 3 (a) and 4 (a) of part 2 of said code, which prescribe maximum weekly working hours and a minimum wage of 40 hours and 32½ cents per hour, respectively, for that defendants, on numerous occasions and as to divers employees, not learners or apprentices, worked their said employees more than 40 hours a week and paid them less than 32½ cents per hour for such work. Defendants have never elected to be bound by, nor have they recognized the provisions of, said code, except occasionally they made reports. This case does not involve any controversy, as to the binding effect of said code on the applicants for it, if any, nor on parties signatory, nor on those who have elected to accept its provisions, if such there are.
Upon the answer or return and motion to dismiss therein contained, and upon the evidence, there is, I think, no question that defendants have violated the provisions of the said code in the behalves set out in the bill of complaint. But in defense they raise a number of questions going to the constitutionality of the act, so far as concerns the power herein sought to be exercised; to the alleged lack of language in the act to warrant the provisions of section 3 (a) and 4 (a) of the code, supra; and to the power of the Congress to delegate to the Executive Department the right to make and promulgate the provisions made by the said code, which purport to fix the hours of labor and the wages to be paid therefor, in the industry here, which defense includes *106 the constitutionality of the act, on which such delegation is bottomed.
The justification for this code in the matters herein complained of (that is, whether any language of the act warrants the power exercised) must be found, if it exists, in the language of subsection (a) of section 3, of the act (15 USCA § 703 (a). For a rather careful reading of the act discloses no other language which can fairly be construed to at all warrant the regulation fixing hours and wages. This language, omitting irrelevant parts and skeletonizing it for ease of understanding, and conceding, arguendo, compliance with antecedent requisites, reads thus: "The President may approve a code or codes of fair competition for the trade or industry, or subdivision thereof represented by the applicant, or applicants if the President finds * * * that such code or codes * * * will tend to effectuate the policy of this title; * * * provided further, * * * the President may as a condition of his approval of any such code, impose such conditions * * * for the protection of consumers, competitors, employees and others * * * as the President in his discretion deems necessary to effectuate the policy herein declared."
That policy is declared in section 1 tit. 1 of the act (15 USCA § 701), in this language: "A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources." (Italics supplied.)
In passing it will be observed as a fact that the Congress twice refers to interstate and foreign commerce as a thing to be affected by the act, as it does again in section 4 (a) thereof (15 USCA § 704 (a). As a matter of law, also in passing, it must be kept in mind that not even the Congress has the power to declare a policy in the teeth of the Constitution, or to make a declared policy any legal excuse for overriding the Constitution. The Congress may, of course, set forth in language called a policy, as other legislative bodies formerly often did, and occasionally now do, in a series of whereases, the reasons and the alleged necessity for the enaction of the law which follows. But neither a policy nor a whereas can add one jot or tittle of force or power to a legislative act when the organic law forbids, or (in case of the Federal Constitution) furnishes no warrant for the passage of the act. If it could, then obviously the Federal Constitution would no longer serve to delimit congressional action. If the word policy, as used, connotes a fixed and irrevocable course of legislation or action, binding in the future, it would be mere rhetoric, for nothing is better settled than that one legislative body cannot, irrevocably, and unchangeably bind succeeding Legislatures.
Also, nothing is better settled than that a court has no power to inquire into or question the motive or reason moving the Congress to pass a statute. Hammer v. Dagenhart, 247 U. S. 251, loc. cit. 274, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724. So it follows that a court may not call in question a legislative statement of a policy so long as the law, passed to carry into effect or promote the expressed policy, is constitutionally valid. Here the Congress enacted section 3 (a) and the other provisions of the act as statutory means designed and calculated, as it deemed, to remedy the ills it set forth in the policy it declared. In effect, the Congress declared that certain enumerated ills, largely affecting interstate and foreign commerce, existed, and that it purposed by the manner and means set forth in the succeeding sections of the act to ameliorate or correct these ills.
If then the means provided are within the field of permissive legislation as defined and limited by the constitutional grant of *107 power, the President was given by the quoted language of section 3 (a) of the act power to adopt and promulgate a code containing the provisions found in part 2 and sections 3 (a) and 4 (a) of said code. For the power was delegated in terms limited only to whatever should be in the presidential discretion deemed meet to effectuate the things set out in the first section of the act, to wit, the policy.
True, the Congress in section 3 of the act (15 USCA § 703) dealt with and prescribed "a code * * * of fair competition." But by the proviso quoted it went farther, and broadened, I think, what is in law generally understood to be included in the phrase, "fair competition." This general understanding of the phrase is well discussed (not including of course, the broader term "unfair trade practices," which is not mentioned in the act) in a late opinion by Judge Otis in the case of U. S. v. Sutherland Lumber Co. (D. C.) 9 F. Supp. 204, 205. Judge Otis said:
"Any given set of regulations, if challenged, or any regulation in the set, if challenged, must be tested to determine whether it has any possible relationship to the subject of fair competition.
"The statute does not define the phrase `fair competition,' but that phrase and the words in it are common and of well-understood significance. `Fair' competition is `open,' `equitable,' `just' competition. It is a competition which is `fair' as between competitors and as between any of them and his customers. But `fair' competition must still be `competition.' The adjective does not destroy the noun. Competition is `the effort of two or more parties, acting independently, to secure the custom of a third party by the offer of the most favorable terms.' Webster's New International dictionary. * * *
"Fair competition must be the opposite of unfair competition. * * * `The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another.' Howe Scale Co. v. Wyckoff, 198 U. S. 118, 140, 25 S. Ct. 609, 614, 49 L. Ed. 972; Hanover Co. v. Metcalf, 240 U. S. 403, 412, 36 S. Ct. 357, 60 L. Ed. 713. * * * When Congress used that phrase, the presumption is it used it as the phrase generally is understood."
To this I agree. But I think the phrase fair competition was vastly broadened by the proviso quoted. But does the fact that the Congress delegated a power to the administrator of the act at all help the situation, even though it be conceded that if the President deemed, as evidently he did, that wages and hours of labor should be fixed as means for the accomplishment of what was designed to be done? No one will contend that the Congress may add to or extend the limits of its legislative power by the mere expedient of delegating power to the Executive Department. For it is too plain for controversy that such a doctrine, in addition to being a violation of the rule that legislative power may not be delegated, would also annul and destroy the constitutional limitation. For if the Congress may not itself legislate, it cannot delegate to a co-ordinate branch of government the power to legislate for it.
So conceding that the fixing of hours of labor and rate of wages was well within the broad authority conferred on the Executive Department by the quoted proviso of the act, Did the Congress have constitutional power, to the extent herein attempted, to do this? The case at bar involves nothing as to this point, except the bald right of the Congress to fix hours of labor to be observed and rates of wages to be paid by defendants in carrying on their business as makers of garments.
It must be kept in mind, as said already, that the act, in numerous places mentions its application to interstate and foreign commerce only. The briefs and the arguments concede that the situation must rest for its validity on the commerce clause of the Constitution. And there can be no doubt that this is true. There is no other constitutional basis for it. The mere facts that the defendants largely purchase the knitted rayon used by them in manufacturing garments, which when made they largely sell in other states of the Union, do not make their business interstate commerce. Before they dealt with the imported materials, and before labor was used on them and wages paid for making them into garments, these materials had come to rest in Missouri; their interstate journey ended. Before these materials, now goods, began again to move in interstate commerce, which an unknown and unidentified portion alone did, labor and wages had wholly ceased to be used on them. When the goods were made it was not definitely known what specific portions of them, if any, would be sold in states other than Missouri.
*108 For the foundation of the above statement I find high and binding authority. For the Supreme Court of the United States in the case of Hammer v. Dagenhart, 247 U. S. 251, loc. cit. 272, 38 S. Ct. 529, 531, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, said this:
"Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation.
"`When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state.' Mr. Justice Jackson in Re Greene (C. C.) 52 F. [104] 113. This principle has been recognized often in this court. Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. Ed. 615, and cases cited. If it were otherwise, all manufacture intended for interstate shipment would be brought under federal control to the practical exclusion of the authority of the states, a result certainly not contemplated by the framers of the Constitution when they vested in Congress the authority to regulate commerce among the states. Kidd v. Pearson, 128 U. S. 1, 21, 9 S. Ct. 6, 32 L. Ed. 346."
Again in the Hammer Case, at page 275, of 245 U. S., 38 S. Ct. 529, 532, it is said: "The maintenance of the authority of the states over matters purely local is as essential to the preservation of our institutions as is the conservation of the supremacy of the federal power in all matters entrusted to the nation by the federal Constitution. In interpreting the Constitution it must never be forgotten that the nation is made up of states to which are entrusted the powers of local government. And to them and to the people the powers not expressly delegated to the national government are reserved."
Upholding the identical principle, and using some of the identical language, are the cases of United Mine Workers v. Coronado Co., 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762, and United Leather Workers v. Herkert, etc., Co., 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566. To the same effect in principle are the cases of Delaware, etc., R. Co. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397; Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237; Bacon v. Illinois, 227 U. S. 504, 512, 33 S. Ct. 299, 57 L. Ed. 615; Crescent Oil Co. v. Mississippi, 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166; Arkadelphia Milling Co. v. St. Louis, etc., R. Co., 249 U. S. 134, 39 S. Ct. 237, 63 L. Ed. 517; Stafford v. Wallace, 258 U. S. 495, 526, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; McCluskey v. Marysville R. Co., 243 U. S. 36, 37 S. Ct. 374, 61 L. Ed. 578; Diamond Glue Co. v. U. S. Glue Co., 187 U. S. 611, 23 S. Ct. 206, 47 L. Ed. 328; Diamond Match Co. v. Ontonagon, 188 U. S. 82, 93, 23 S. Ct. 266, 47 L. Ed. 349; Capital City Dairy Co. v. Ohio, 183 U. S. 238, 22 S. Ct. 120, 46 L. Ed. 171; Cornell v. Coyne, 192 U. S. 418, 428, 24 S. Ct. 383, 48 L. Ed. 504; Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346; Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Woodruff v. Parham, 8 Wall. 123, 19 L. Ed. 382; United States v. E. C. Knight Co., 156 U. S. 1, loc. cit. 12, 13, 15 S. Ct. 249, 39 L. Ed. 325; New York Central Ry. Co. v. Mohney, 252 U. S. 152, 155, 40 S. Ct. 287, 64 L. Ed. 502, 9 A. L. R. 496; Minnesota v. Blasius, 290 U. S. 1, 9, 54 S. Ct. 34, 78 L. Ed. 131, and Chassaniol v. Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004.
The case of Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 396, 67 L. Ed. 785, 24 A. L. R. 1238, is squarely in point as an authority for the view that not even the possession of police power can confer on the Congress the right to pass a law which fixes the wages to be paid employees, who are not engaged in some manifestation of interstate commerce, or in any business not coupled with a public interest. The Supreme Court in the Adkins Case, supra, had under review the Act of Sept. 19, 1918 (40 Stat. 960) which provided for fixing, in the District of Columbia, minimum wage standards for women. Notwithstanding the fact that the Congress has, perforce the Constitution, the same authority to legislate for the District of Columbia as a state Legislature has to pass laws within a state (Mattingly v. District of Columbia, 97 U. S. 687, 690, 24 L. Ed. 1098), the above act was held to be unconstitutional.
In short, the ruling in effect was, that such a statute was not even within the police power of a state. It does not detract at all from the binding force of the rule, so *109 far as the case at bar is concerned, that a number of the states of the Union have (with deference, correctly) justified similar statutes under the police power, as was pointed out in the dissenting opinion by Mr. Chief Justice Taft. But as forecast, it is plain that if the Congress exercising police power within the District of Columbia may not pass a valid act fixing a minimum wage standard for women, then it has no power under the Constitution to pass an act which fixes such a standard for both women and men, in a situation wherein no phase of commerce between the states is involved.
In the Adkins Case, supra, as here, the contention made against the validity of the act there up for judgment, was: "That it authorizes an unconstitutional interference with the freedom of contract included within the guaranties of the due process clause of the Fifth Amendment." And touching this question the Supreme Court said (at page 545 of 261 U. S., 43 S. Ct. 394. 396) this: "That the right to contract about one's affairs is a part of the liberty of the individual protected by this clause is settled by the decisions of this court and is no longer open to question. Allgeyer v. Louisiana, 165 U. S. 578, 591, 17 S. Ct. 427, 41 L. Ed. 832; New York Life Insurance Co. v. Dodge, 246 U. S. 357, 373, 374, 38 S. Ct. 337, 62 L. Ed. 772, Ann. Cas. 1918E, 593; Coppage v. Kansas, 236 U. S. 1, 10, 14, 35 S. Ct. 240, 59 L. Ed. 441, L. R. A. 1915C, 960; Adair v. U. S., 208 U. S. 161, 28 S. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764; Lochner v. New York, 198 U. S. 45, 25 S. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133; Butchers' Union v. Crescent City Co., 111 U. S. 746, 4 S. Ct. 652, 28 L. Ed. 585; Muller v. Oregon, 208 U. S. 412, 421, 28 S. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957."
The court then proceeded to discuss four classes of cases which it found were exceptions to the rule. Without taking up time to reiterate these, since the curious may read the court's opinion, it suffices to say that the undisputed facts in the case at bar make it fall without each of the excepted categories.
The cases of Wilson v. New, 253 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, and Ft. Smith, etc., R. Co. v. Mills, 253 U. S. 206, 40 S. Ct. 526, 64 L. Ed. 862, as also the case of Baltimore & Ohio R. Co. v. Interstate Commerce Com., 221 U. S. 612, 31 S. Ct. 621, 55 L. Ed. 878, are strongly relied on by plaintiff here as affording justification for the validity of section 3 (a) of the act here under examination, and as authorities for the power to fix hours of labor and minimum wages, as provided in the code here attacked by defendants.
The Wilson Case, and the Mills Case, both supra, arose under the so-called Adamson Law (45 USCA §§ 65 and note, 66), which by its very title applied only to interstate and foreign commerce. See, also, Mills Case, supra, at page 207 of 253 U. S., 40 S. Ct. 526. So these two cases fall into one of the excepted categories of the Adkins Case, supra, as already pointed out. Likewise, the Baltimore & Ohio Railroad Case, supra, falls into another exception, and is not at all in conflict with what I have said and with what in dozens of cases the Supreme Court has said. Moreover, the law considered in the latter case, while limiting the hours of service in a business coupled with a public interest, did not limit the rate of wages. (See, Wilson v. New, supra, at page 362 of 253 U. S., 37 S. Ct. 298, concurring opinion.) In addition, and with reference to the railroad cases relied on by plaintiff, it is difficult to discern any controlling similitude between a law which limits hours of labor in a business wherein lack of vigilance induced by somnolence may cause loss of life or limb to passengers, and a law which fixes both hours of labor and wages for employees engaged in making lingerie, infants' rompers, et id omne genus.
The commerce clause of the Constitution (article 1, § 8, cl. 3) has not been amended or changed, nor has the concept of what constitutes interstate commerce so far changed, as to permit the clear and strong language of the Supreme Court in the cases I cite and from which I quote to be disregarded by an inferior court. It is to be conceded, of course, that things well-nigh ridiculous indirectly and faintly lessen and so affect the volume of interstate commerce. A fisher of shrimps domiciled on a Mississippi island in the Gulf of Mexico, who habitually procures his food and other provisions from Mobile and who goes out and catches a fish for his dinner, has infinitesimally lessened the flow of interstate commerce. But would it be contended for a moment that the Congress has the power, perforce the commerce clause of the Constitution, to regulate the methods and hours of this fisher of shrimps?
In the light of stare decisis, and on undisputed facts in this case, it seems impossible to say without stultification that defendants' business and dealing involve any *110 phase of interstate commerce warranting regulation of them by the Congress. For it is, I think, beyond dispute, that from the case of Woodruff v. Parham, 8 Wall. 123, 19 L. Ed. 382, down to the cases of Minnesota v. Blasius, 290 U. S. 9, 54 S. Ct. 34, 78 L. Ed. 131, and Chassoniol v. Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004, the Supreme Court has laid down and reiterated in language and principle, "without change or shadow of turning," the rule I have quoted from In re Greene (C. C.) 52 F. 104, 113, which unambiguously sets forth when interstate commerce begins to control articles made in a state of the Union, even when such articles are designed for sale in other states.
Therefore, since the cases ruled by the Supreme Court, which I have cited, and dozens of others which could be cited, are either squarely, or in inescapable principle, against the validity of a federal law which fixes wages and hours of labor in a private and wholly intrastate business, uncoupled with any public interest, and since I find myself wholly unable otherwise to construe these cases, as an inferior court, I am bound to follow them. If these cases are to be overruled, or not to be followed, this duty or privilege is for the court which announced them. It is beyond my power, as an inferior court, to overrule them, and beyond my ability to distinguish them.
So I am constrained to conclude that no valid power lies in the Congress to fix by law hours of labor and a minimum wage scale for the employees of the defendants. It follows that the temporary injunction prayed for by plaintiff should be denied, and so it is ordered.