**Joseph S. GULLO et al., Appellants,**

v.

**VETERANS COOPERATIVE HOUSING ASSOCIATION, Appellee.**

**No. 13516.**

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 12, 1957.

Decided July 1, 1957.

Petition for Rehearing Denied Sept. 11, 1957.

Mr. Joseph S. Gullo, Washington, D. C., appellant, pro se, with whom Mr. George Thomas Montgomery, Washington, D. C., was on the brief, for appellants.

Mr. James R. Worsley, Jr., Washington, D. C., with whom Messrs. Paul Daniel and Carlyle Conwell Ring, Jr., Washington D. C., were on the brief, for appellee.

Before WILBUR K. MILLER, DANAHER, and BASTIAN, Circuit Judges.

DANAHER, Circuit Judge.

The District Court granted the motion of the appellee (Association) for summary judgment in an action in which the appellants[1] sought $15,000 for the loss of the Gullo apartment, $5,000 on account of rights and interests in apartments held by the Association for rental, $15,000 as punitive damages, $5,000 for physical discomfort and mental anguish because of eviction from the Gullo apartment and for the expense of relocation elsewhere; and "such other and further relief as is just." The facts pertinent to the issues will be developed as we proceed.

Gullo and the Association entered into an agreement on December 7, 1947, under the terms of which Gullo, upon payment of the sum of $50 became a member of the Association entitled to "all rights and privileges of membership." By virtue of such membership, Gullo became entitled to purchase from the Association a right of perpetual use and enjoyment of apartment No. B–394 in a project known as Naylor Gardens.

The original perpetual use agreement was superseded by an instrument dated September 16, 1949, known as a mutual ownership contract. In accordance with its terms, Gullo agreed to pay to the Association as the purchase price for the perpetual use the sum of $7,350 "on terms and with interest" as in the contract provided. Gullo made a down payment of $1,682.09 and was bound to make payment of the unpaid balance of the purchase price in equal monthly principal and interest payments of $4.175 for each thousand dollars of the original assigned price of the perpetual use less the down payment, interest to be included on the unpaid balance at the rate of 3% per annum. It was agreed that the "original assigned price shall be the amount set or established by the Association as the value of the Perpetual Use on the date of the conveyance of the Project [Naylor Gardens] by the Government to the Association." When the total purchase price had been paid in full, principal and interest payments were to cease "and the Member shall continue to enjoy all the rights and privileges provided under this Contract, subject to the payment of the Operating Payments as hereinafter provided."

Gullo defaulted in the April 1, 1954, payment, and on April 12, 1954, commenced this action. The mutual ownership contract provided that in the event of default by the member as to any of the payments or charges required to be made, the Association might terminate the contract upon ten days' written notice. Acting pursuant thereto the Association's Board of Directors by resolution of April 23, 1954, exercised its authority to terminate the contract. Furthermore, the Association exercised its election, permitted by the contract, to purchase Gullo's perpetual use. The reasonable market value of the perpetual use, calculated as the contract provided, was $9,000. After deduction of the unpaid balance of the purchase price and the estimated cost of maintenance,

---

1. We will treat the appellants, husband and wife, as one, hereinafter referred to as Gullo.

repairs, painting and decorating, and in furtherance of the Board's resolution to purchase Gullo's perpetual use for an amount "equal to the current value of such perpetual use," the Association tendered to Gullo its check for the balance, computed to be $3,781.41. Gullo received but has never cashed the check.

Careful consideration of the stipulation of facts, the pleadings, the affidavits and the exhibits, has convinced us that the Association was authorized to take each of the steps thus far noted. We are satisfied that the District Court correctly concluded that no genuine issue of material fact existed with respect to the valuation of the perpetual use and that the sum of $3,781.41 was properly found to be due to Gullo as provided in the mutual ownership contract.

Moreover, we are satisfied that Gullo is entitled to no recovery on account of the "humiliation" of which he complains, which stemmed from the circulation of a petition by and among certain other members of the Association and which called for the expulsion of Gullo. No facts have been pleaded and none otherwise exhibited showing, or tending to show, that the circulation of the petition was the act of the Association. Indeed, the contrary appears. On no theory of Gullo's claim deducible from this record is there a basis for punitive damages. To the extent that Gullo predicates this aspect of his claim upon his eviction, there can be no question that Gullo's April 1, 1954, default in the payments then due was the result of his own decision. His continued default was a matter of reasoned, if ill-advised, personal choice. The steps thereafter taken by the Association to gain possession of the perpetual use were authorized by the contract and strictly in accordance with its terms. We are all in accord that on the aspect of the case so far considered, no error was shown.

My colleagues say that Gullo is entitled to no additional relief and that the circumstances resulting in the discharge of his right under the mutual ownership contract likewise worked a termination of his interest in the equity assets of the Association. They would affirm, without more.

Affirmed.

DANAHER, Circuit Judge (dissenting in part).

I would go farther, for it seems to me that the peculiar facts present a case of unjust enrichment as to which equity should afford relief. As I see the case, Gullo should be accorded the same pro rata entitlement, as of the date of suit, as the other members had voted for themselves under their plan of corporate reorganization. I would reverse on this phase of the case leaving the actual framing of the decree to abide the establishment of the respective equities in further proceedings in the District Court. As briefly as the complicated situation will permit, I will outline the highlights of the circumstances which suggest the course I would adopt. Gullo's prayers that he be made whole with respect to his interest in apartments held for rental and for "such other and further relief as is just" are compatible with and flow from his allegations and from the facts of record.[2] The basis for his claim, as I see it, will presently be developed.

The Association argues that no matter what rights Gullo asserts he may have acquired, the doors of the courts must be closed to him and, under the cir-

---

2. A previous class action commenced by Gullo and another was dismissed in 1952. Gullo v. Veterans' Co-op. Housing Ass'n, D.C.D.C., 13 F.R.D. 11. The present suit originally had named as defendants certain directors whose motion to dismiss as to them was granted "without prejudice" in 1954. No appeal was taken from that order. We are presently bound so to construe the pleadings "as to do substantial justice." Fed.R.Civ.P. 8(f), 28 U.S.C.A. "This mandate is the heart of the rules on pleadings." 2 Moore's Federal Practice 1711 (2d ed. 1948). See Keiser v. Walsh, 1941, 73 App.D.C. 167, 118 F.2d 13; cf. Mayflower Hotel Stockholders P. C. v. Mayflower Hotel Corp., 1949, 84 U.S.App.D.C. 275, 173 F.2d 416.

cumstances here, no remedy can be available. Perhaps the position of the appellee can most readily be illuminated by a quotation from the summary of its argument as set forth in its brief:

"Among the undisputed facts is the execution by appellants and appellee of a contract as of September 16, 1949. By the terms of the contract appellee extended to appellants membership in appellee corporation, agreed to deliver the perpetual use of a designated apartment and to provide appellants with specified services in connection with their occupancy of the apartment. Appellants agreed to pay to appellee an amount designated as the purchase price—a portion in cash at the time of the purchase and the balance with interest in monthly payments. Appellants also agreed to make a monthly payment to cover the estimated cost of operating services, utilities and reserves. The facts are undisputed that appellee performed its contractual obligations described above. It is also undisputed that during the life of the contract appellee performed or omitted to perform the following additional acts which appellants contend constituted a breach of the contract between the parties or a breach of a fiduciary duty owed by appellee to its members: (1) In 1951 appellee suspended further efforts to increase the number of its members; (2) From time to time appellee purchased the membership interests of members who wished to withdraw from membership; (3) In 1951 and 1952 appellee designated a portion of the monthly member's payment provided for in the contract as a capital contribution; (4) Appellee has not distributed or apportioned any 'Net Savings' as defined in D.C. Code (1951 Ed.) section 29–801; (5) In March 1953 the Board of Directors began prep-

aration of a plan for reorganizing the corporation and in March 1954 the membership of appellee by a vote of 122 to 28 approved a proposed plan of reorganization and instructed the Board of Directors to proceed with a more detailed formulation to be further considered by members."

The various steps which the Association "performed or omitted to perform" as above listed provide only a small measure of understanding of the total situation. This cooperative Association had been incorporated as of January 3, 1946, as a mutual ownership, non-profit corporation, under the District of Columbia Cooperative Association Act.[3] Each member contracted with each other member and with the Association itself that the Association and its affairs should be conducted to achieve the corporation's stated purposes. The Association agreed with its members to hold and manage its assets for the accomplishment of those purposes. The Articles of Association show that the corporation was organized without share capital and was to consist of not more than 5,000 members. No person was to acquire an interest in the capital of the Association other than a duly accepted member. The Articles further provided:

"The maximum amount or percentage of capital which may be owned or controlled by any member shall be a single membership interest * * The joint ownership of a membership interest by a husband and wife * * * shall be permissible * * *.

* * * * *

"Membership shall be limited to persons who occupy or intend to occupy living quarters owned by the Association, except that provisions may be made in the by-laws for the *temporary holding of a membership interest* by a member, his heirs or assigns, *without occupancy, following* voluntary or *involuntary* termination of occupancy of living quarters *by the member*

3. D.C. Code 1951, §§ 29–801 to 29–847.

*who owns the membership interest."* (Emphasis supplied.)

Of course, all of the applicable provisions of the Act, as well as those in the Articles and the by-laws, with the benefits therein provided, constituted part of the basis of the relationship between a member and the Association. The Articles provided for amendment only in accordance with the provisions of the enabling Act, and no amendment was to be permitted which might "violate the terms, covenants, or conditions of any trust created or any agreement entered into by the Association." In various ways, by the Articles and by the by-laws, each member was promised that the Association was not to engage in any activity for the purpose of obtaining profit or pecuniary gain for members but, rather, that the Association's assets were to be managed for the mutual benefit of the members. To that end it was agreed that the Association was to enter into an appropriate agreement with the Federal Government for the acquisition of Naylor Gardens Housing Project located in Washington, D. C.

The housing development, Naylor Gardens, had been constructed by Defense Homes Corporation, a Federal agency, and was completed in 1944 at a cost of $6,587,000. The project consisted of 51 brick buildings containing 748 apartment units of one, two and three bedrooms. The Government, acting by and through the National Housing Agency, in accordance with the provisions of the Surplus Property Act of 1944, as amended,[4] and the Defense Homes Corporation, agreed by contract dated January 15, 1947, to sell Naylor Gardens to the Association for $5,125,-000, upon a down payment of $512,500, the balance of $4,612,500 to be payable on terms prescribed in a deed of trust note and accompanying deed of trust as security.

The contract with the Government had provided that the Association was to produce initially "substantially Three Hundred (300) member occupants of the project," failing of which, the contract for the sale and purchase of the project was to terminate.

Under such circumstances Gullo paid $50 as a membership fee, and as a qualified veteran, he became an accepted member of the Association as of December 7, 1947. Two other agreements were entered into. One was the separate mutual ownership contract, previously mentioned and superseded in 1949, in which he agreed to pay $7,350 for the apartment set out to him. Qualified as a member, Gullo and the Association also executed an escrow agreement as of December 7, 1947, which recited that the Association, as a party to a contract for purchase and sale of Naylor Gardens, required that member Gullo pay to the Association for the purpose of and incident to the settlement of the purchase and sales contract with the Government, an amount which should be not less than 10% of his purchase price of apartment B–216 under the mutual ownership contract. Thus, his payment, with like payments by others, totalled $512,500 and made it possible for the Association to make its required 10% down payment on the project. The escrow agreement recited: "Such percentage shall be allocated among the units occupied by member occupants in relation to the purchase price of their respective units." If the proposed transaction with the Government should fail, the Association agreed to return to Gullo the entire amount tendered as a down payment. It was stipulated in the District Court that, as of May 1954, some 396 membership interests, including Gullo's, had been issued for $2,853,-620. Accordingly, Gullo's "membership interest" was stipulated to be .002575675 of the total of original purchase prices of membership interests.

That the "membership interest" possessed real meaning may be seen from the Association's Articles. Dissolution was to be accomplished "under the

---

4. 58 Stat. 765, as amended, 50 U.S.C.A. Appendix, §§ 1611–1646 (1952), and see

SPB Reg. No. 1, 10 Fed.Reg. 3764, and SPA Reg. No. 5, 10 Fed.Reg. 12812.

method provided by Title 29, chapter 8, Section 29–836" of the D.C. Code,[5] the assets to be distributed "by returning to the members the book value of membership interest, the amount paid on their subscriptions to membership and any lawful distribution of interest upon capital contributions * * * by returning to members in proportion to their payments and their class of membership their savings returns accumulated during the six years immediately prior to dissolution; and any surplus remaining thereafter shall be contributed as a gift to the District of Columbia for the benefit of Veterans of World War II * * *."

Commencing in 1951, there was a change in the Association's policy which Gullo opposed, then and since. Although it had covenanted with the Government that without the latter's consent it would not levy assessments on its members or grant leasehold estates in the project for a term in excess of twelve months "except through the sale of the perpetual use and enjoyment of a dwelling unit to a member," assessments were levied. Repurchase of membership interests was begun, and 32 such interests were purchased. No new membership interests were issued. The "unsold" apartments were turned into rental units. The Executive Committee of the Board of Directors sent a report to the members in April, 1952, pointing out that under the Articles, upon dissolution "all remaining assets (profits) no matter how large or small would have to be turned over to the D. C. Government for the benefit of Veterans of World War II. Do you want this section of the articles of incorporation to

be changed so that all remaining assets (profits) would be divided among the members in proportion to the original purchase price of their apartments or some similar but equitable formula?" 95% said they wanted this changed. 60% of the members favored selling the project outright "if their proportionate share of the profit were between $1,000 and $8,000."

As Exhibit B to the Association's affidavit appeared a resolution adopted at a meeting of the membership on March 26, 1954. It was then resolved that the Board take action to perfect a plan of reorganization "at the earliest possible date." The plan, as outlined to the membership, read in part:

"Under the present-type organization it is difficult for a member who must leave town, or for other personal reasons dispose of his contract, *to recover the full value of his holdings in the Association.* It is difficult for him to convince a prospective purchaser that in the Mutual Ownership Contract he has an interest in anything other than the right to occupy one apartment. If he had, in lieu of the Mutual Ownership Contract, a 99-year lease representing his right to the apartment, and shares of stock in the corporation, it would be much easier for him to show the value of his holdings. Each share of stock would represent a known portion of the total equity of the corporation. This could readily be determined by any member."[6]

Discussing the uncertainties of the Association's legal situation, the Board further advised the members that with

---

5. This section provides that dissolution may be voluntary, or on stated grounds, involuntary. In the instant case, were the Articles to be followed, after certain payments recited, the "surplus" would accrue to the District of Columbia. The equity here may run into several million dollars which the members would preempt to themselves under the scheme of their proposed reorganization, completion of which was suspended, no doubt because this action was commenced so

promptly after the membership's self-serving vote. By April through May, 1954, the balance owing to the Government had been reduced to $3,787,375.90, the stipulation of facts discloses. The District of Columbia has not been named as a party notwithstanding the above provision.

6. We have added italics as they appear in quotations from the Association's exhibits.

the "present" organization, "it is impossible to know with certainty what is *the par value of each member's membership certificate,* what is the amount paid on subscriptions, who are patrons and what is patronage." It was recommended that the Association reorganize under the plan, which the members approved, so that:

" * * * each member will receive one share of stock for each $10 of the original price of his apartment. Initially, each member would be issued one share of stock for each $10 of down payment and principal payments made on his Mutual Ownership Contract; and he would subscribe for additional shares equal in amount, at a value of $10 each, to the unpaid balance of his Mutual Ownership Contract. The subscribed shares could then be issued, perhaps annually, equivalent to payments of his subscription.

> \* \* \* \* \*

"Each member would be permitted to transfer his lease and stock but neither could be transferred separately * * *."

The Association's auditing committee[7] report took note of the fact, as the Association's manager in his affidavit had recited, that in 1951 and 1952 there had been a levy upon the members denominated a "capital contribution" and that "a *means can and should be, devised for crediting* [certain] *funds to the members on the books* of the Association on a *membership basis* in order that *upon dissolution,* or *earlier if deemed advisable,* the *apportioned*

*parts may be returned to the members in proportion to their participation in the payments."*

When the membership on March 26, 1954, voted to adopt the plan of reorganization as outlined, it also directed the Board "to take such action as they may deem necessary to perfect this plan of reorganization at the earliest feasible date." Gullo promptly protested, and thereafter receiving no reply, he commenced this action on April 12, 1954.

The Association brief points out that "Appellant's legal rights and interests, which are identical with the legal rights and interests of all members of the appellee corporation, are derived from the Mutual Ownership Contract, the Articles of Association and By-Laws of the appellee corporation, and the laws of the District of Columbia." If we amend that statement to include *equitable* as well as "legal rights and interests,"[8] and take account of the Association's covenants in its deed of trust, it correctly defines Gullo's status and that of each of his associates as of April, 1954. We see the Association with an equity, worth perhaps millions, which Gullo like the others had made possible and in which they would share while they exclude him. As veterans, organized ostensibly into an entity on a mutual, non-profit, cooperative basis, they had obtained from the Government for $5,-125,000 a housing project, only three or four years old, which had cost over $6,587,000 to construct. When rent control had terminated, no longer were apartment interests to be sold to other veterans, the membership decided. While outstanding indebtedness to the Government persisted,[9] despite the As-

---

7. The by-laws had provided for the creation of an auditing committee to be chosen by the Board of Directors with the duty to audit the books of the Association twice annually, and to give a written report in each instance to the members. And see D.C. Code, 1951, § 29–833.

8. Courts here in the District have noted that the nature of a cooperative interest may vary with the particular circumstances of each situation. See, e. g.,

Hicks v. Bigelow, D.C.Mun.App.1947, 55 A.2d 924; 1915 16th St. Co-op. Ass'n v. Pinckett, D.C.Mun.App.1951, 85 A.2d 58, and cases cited in dissent at page 61.

9. Cf. Loftus v. Mason, D.C.E.D.Va.1956, 139 F.Supp. 207, affirmed 4 Cir., 1957, 240 F.2d 428, certiorari denied, sub nom. Shirley-Duke Apartments v. Mason, 1957, 353 U.S. 949, 77 S.Ct. 860, 1 L. Ed.2d 858.

sociation's covenant to preserve **its** status and not to amend its Articles of Association, it voted to reorganize, as promptly as feasible, as we have seen. The shares were to be issued on a basis measured by the members' respective payments to the corporate treasury to be sure, but the book value of those shares was represented, not only by the value of the legal interest under the mutual ownership contract, but by the equity in the Association's assets as well. That equity reflected not only the down payment but the payments thereafter in reduction of the Government's note and the appreciated value of a vast project worth several millions of dollars, the exact amount not being shown on this record. The relationship of the various members, while technically corporate, possessed many of the indicia of a joint venture.[10] The combination of individual interests springing from the common effort, based upon mutual trust and confidence, gave rise to a fiduciary relationship which should be regarded.[11] I would recognize and apply the growing tendency in the courts "to disregard corporate entity and to treat the stockholders thereof as an association of individuals when the interests of justice are to be served."[12] Here the members were not intended to be stockholders. They were, indeed, individual members of an association, shielded against liability, but measuring out to themselves a separate asset so that each might "recover the full value of his holdings in the Association" in that "each share of stock would represent a known portion of the total equity of the corporation." They said that was precisely what they were doing and what they intended to do so that "it would be much easier for [each member] to show the value of his holdings."

More argument, in greater detail, might be advanced, but enough has been said to demonstrate why I believe an action here properly lies against the Association as the agent of its various members. Through the entity the individuals should not unjustly enrich themselves by sequestering Gullo's equity interest which, as of the date of suit, was identical with theirs, pro rata. Likewise they should not, in the circumstances here, be permitted to use the Association as a shield against Gullo's asserted rights, and hence argue, as is certainly urged, that no matter what the Association has done or omitted to do, Gullo as an individual can have no claim against the Association. I believe it would be unconscionable and unjust that other members be permitted to have added to the value of their shares, the April, 1954, equity interest represented by Gullo's membership simply by divesting him of that value and by the Association's refusal to recognize and compensate him for that value.[13]

Here, the Code provided, since the Association was organized without shares, the Articles were to provide "the rule by which [the members'] rights shall be determined."[14] That was not done as far as I can see. Accordingly, Gullo should receive, at the very least, a certificate for his paid up membership capital[15] and thereupon be dealt with as the Code provides.[16] Alternatively, had Gullo acquiesced and had

10. Eagle-Picher Co. v. Mid-Continent Lead & Zinc Co., 10 Cir., 1954, 209 F.2d 917, 919.

11. Cf. Appleman v. Kansas-Nebraska Natural Gas Company, 10 Cir., 1955, 217 F. 2d 843, 848.

12. Metropolitan Holding Co. v. Snyder, 8 Cir., 1935, 79 F.2d 263, 266, 103 A.L.R. 912. Cf. Callas v. Independent Taxi Owners' Ass'n, 1933, 62 App.D.C. 212, 66 F. 2d 192, certiorari denied 1933, 290 U.S. 669, 54 S.Ct. 89, 78 L.Ed. 578; Kaufman v. Societe Internationale, 1952, 343 U.S. 156, 72 S.Ct. 611, 96 L.Ed. 853; and see Hawes v. Oakland, 1882, 104 U.S. 450, 460, 26 L.Ed. 827.

13. Without attempting analysis and application of myriad cases of constructive trust, compare Anglo-American Savings & Loan Ass'n v. Campbell, 1898, 13 App. D.C. 581, 602–603, 43 L.R.A. 622 et seq.

14. D.C. Code 1951, § 29–805(9).

15. D.C. Code 1951, § 29–825.

16. D.C. Code 1951, § 29–826 et seq.

the proposed reorganization been completed as of April, 1954, he would have been accorded 371 shares.[17] If the reorganization proceeds, as voted, he would seem still to be entitled to shares on that same basis.

I am satisfied that summary judgment was not appropriate in the circumstances of this litigation. I would send the case back for a determination of the value of the Association's equity in April, 1954, and of Gullo's interest in it.[18]

---

17. Of course some method of adjustment of odd dollar amounts would undoubtedly have been evolved. It is clear the membership satisfied itself that each $10 of principal payment was to be a proper *measure* of a share, of value unknown, in the Association's equity. The "reasonable market value" of Gullo's legal interest in his "perpetual use" was ascertained by the Board to have a dollar valuation of $3,718.60, as we have seen. The exact form of the decree need not further concern us here, for appropriate terms would be fashioned in the light of facts to be developed and conclusions to be drawn therefrom essential to an equitable reflection of Gullo's interest.

18. Hyman v. Regenstein, 5 Cir., 1955, 222 F.2d 545, 549.