**Don A. LOFTUS et al.**

v.

**Norman P. MASON, Commissioner of Federal Housing Administration, et al.**

**SHIRLEY–DUKE APARTMENTS, SECTION I, INC., et al.**

v.

**Norman P. MASON, Commissioner of Federal Housing Administration, et al.**

**Civ. Nos. 1163, 1188–1190.**

United States District Court
E. D. Virginia, Alexandria Division.
Feb. 10, 1956.

Armistead L. Boothe, Alexandria, Va., for plaintiff Don A. Loftus and others.

Carl L. Budwesky, Alexandria, Va., for plaintiffs Shirley-Duke Apts. and others.

Carl Eardley, and Max L. Kane, Dept. of Justice, Washington, D. C., and Harlan E. Freeman, Asst. U. S. Atty., Alexandria, Va., for defendant.

BRYAN, District Judge.

To encourage the erection of low cost rental housing the Congress of the United States authorized the Federal Housing Administration to insure repayment of loans made for that purpose up to 90% of the estimated cost of the projects.[1] Under this law the Beverley Manor corporations and the Shirley-Duke corporations obtained loans, on

1. National Housing Act, approved June 27, 1934, 48 Stat. 1246, as amended by addition of section 608, May 26, 1942, 56 Stat. 303, and as thereafter amended, 12 U.S.C.A. §§ 1701 et seq., 1743.

their notes secured by mortgages on the properties and insured by the Administration, in the sum of $8,826,400 and $13,746,000, respectively. The actual cost of the completed project of Beverley Manor was $762,654.53 less than its insured loan and of the Shirley-Duke $1,878,937.16 below its insured loan. However, the full proceeds of the loans had been received by the corporations, and soon after the completion of the projects the corporations disbursed these remaining moneys—the difference between the actual cost of the projects and the insured loans—to its stockholders as dividends. These differences were made apparently available for dividends by carrying the moneys into "surplus", on the corporation's balance sheet, through a write-up, on a reappraisal, of the valuation at which the projects were entered. The Federal Housing Commissioner, being of the opinion that the corporate charters prohibited the payment of dividends out of any funds or assets except earnings, formally declared the instant appropriations violations of the charters. The court concurs—the insured moneys were not available for dividends.

As a part of the insurance plan the Commissioner had acquired at a nominal price all of the preferred stock of each corporation. Each charter provided that any violation of its terms should be considered a default on the part of the corporation; and upon any such default the charter empowered the Commissioner, as the sole preferred stockholder, to remove the board of directors and elect a new set of his choice. On receipt of notice of his intention to invoke this sanction, the corporations brought these suits to enjoin his proposed action.

The Beverley Manor corporations are four in number, one for each section of the project by that name located in Columbus, Ohio. They are chartered in Virginia and each procured a loan insured by F.H.A., the four aggregating the $8,826,400 already mentioned, for the construction of a section of the housing project. There are six Shirley-Duke corporations, all chartered by Virginia, with a separate corporation for each section of the rental housing project in Alexandria, Virginia, known as Shirley-Duke Apartments. The loans aggregating $13,746,000 and already described as insured for the Shirley-Duke corporations were divided among these six corporations. Beverley Manor and Shirley-Duke charters are almost identical, as are the by-laws, the mortgages, and the pertinent terms of the insurance applications, insurance commitments, and contracts of insurance.

The grounds upon which the court sustains the Commissioner in these cases render it unnecessary to notice the wide divergences between the two projects in accomplishing the construction of the housing units, their methods of preliminary and interim financing, and their procurement of professional and specialized services. Moreover, for its decision the court assumes, without finding, that the sponsors, owners, and mortgagors presented lawful valuations of land and estimates of cost, that the loans were granted and insured in accordance with the National Housing Act as well as the rules and regulations of the Administration, and that the reappraisals were fair. As default has been found on other grounds, the court deems it unnecessary to pass upon the asserted default consisting of the payment to the mortgagee by the Shirley-Duke corporations of a fee or other consideration amounting to 6½% of the original amount of the loans, the Commissioner alleging the exaction to be in violation of the rules and regulations of the Administration and of the contract of insurance. Besides, it would be inadvisable to do so, for the resolution of that issue entails a complex factual determination and should be resolved, if it need be, only in an appropriate action for the recovery of such payment or any part thereof, no such relief being sought in the cases at bar.

I. The court is of the opinion that the dividends in suit contravene these charter provisions:

"Article IV.

\*　　\*　　\*　　\*　　\*　　\*

"(b) The net earnings of the corporation, after providing therefrom dividends on First Preferred Stock and on the Second Preferred Stock as hereinabove provided, and all reserves hereinafter required, may be applied each year in payment of dividends to the holders of Common Stock or may be applied or used in the redemption of the Second Preferred Stock as hereinafter provided. [No second preferred stock was ever issued.]

\*　　\*　　\*　　\*　　\*　　\*

"Article V.

"The Corporation shall not without prior approval of the holders of a majority of the shares of First Preferred Stock, given either in writing or by vote at a meeting of the First Preferred Stockholders called for that purpose (a) assign, transfer, dispose of or encumber any real or personal property, including rents, except as specifically permitted by the terms of the mortgage or deed of trust, \* \* \*."

In interpreting these clauses it is imperative throughout to remember that the charter is not the constitution of an independent corporation. It must be constantly recalled, too, that the preferred stockholder is not just a shareholder. The corporation is as much an instrument of F.H.A. as it is of its own sponsors and stockholders. Furthermore, the preferred stockholder is a dominating creditor, if not indeed the real and only standing creditor, of the borrower; the preferred stockholder has insured, to the mortgagee, the repayment in its entirety of a loan presumably equal to 90% of the value of the corporation's total assets—a heavy contingent liability, especially so in view of the high ratio of the loan to the security. The corporation is the focal point of the plan formulated and adopted by F.H.A.

to accomplish the Congressional aim expressed in the National Housing Act. Instead of invoking contractual checks upon the borrower to safeguard F.H.A.'s liability, the Commissioner reins the borrower through a charter fashioned for the purpose. The Commissioner has followed the suggestion of the Act itself that:

"(1) The mortgaged property shall be held by a mortgagor approved by the Commissioner. The Commissioner may, in his discretion, require such mortgagor to be regulated or restricted as to rents or sales, charges, capital, structure, rate of return, and methods of operation. The Commissioner may make such contracts with, and acquire for not to exceed $100 stock or interest in any such mortgagor, as the Commissioner may deem necessary to render effective such restriction or regulation \* \* \*."[2]

To this end the Commissioner required the borrower to incorporate under a model and a single purposed charter which states the chief object of the incorporation to be the provision of housing for rent or sale and the obtaining of mortgage insurance from the Federal Housing Commissioner. This charter gives the preferred stockholder, for the period of the insurance, complete oversight of the corporation, its real and personal property, its revenues, and its disbursements. Under its terms the only corporation funds or property distributable or alienable, except for operating costs, without the approval of the preferred stockholder are net earnings.

The charter creates common stock consisting of 200 shares without par value. This was subscribed for and taken by the sponsors or builders of the project. The charter also establishes first preferred stock of 100 shares with a par value of $1 each and a dividend right of 5¢ per share annually. The Commissioner purchased all of the authorized preferred stock. That the other corporate

2. Sec. 608(b) (1), 12 U.S.C.A. § 1743(b) (1).

articles straiten, as severely as we have stated, the privileges and powers ordinarily exercised by the directors and common stockholders of a corporation, is confirmed by a review of them.

"So long as any property of this corporation is encumbered by a mortgage or deed of trust insured by the Federal Housing Commissioner, this corporation shall engage in no business other than the construction and operation of a Rental Housing Project or Projects", is the restriction appearing in the charter's declaration of the corporate purposes. The preferred stock is not redeemable before the termination of the mortgage insurance. No dividends can be paid, without the consent of a majority of the preferred and common stock outstanding, "until all amortization payments due under the mortgage insured by the Federal Housing Commission have been paid" and the monthly reserve for replacements, required by the mortgage loan agreement, has been set aside. No disbursement of any kind from this reserve can be made without the consent of the preferred stockholder. Without such consent no rental can be fixed and no consolidation, merger, or voluntary liquidation is allowed.

Of all the restrictions in the charter article V(a), supra, is the most comprehensive and effective. It is a broad, deliberate, and studied denial of the jus disponendi congenital in the corporation; and, again, we are reminded that the corporation is not an independent commercial entity. The restriction is not confined to that personal property, real estate, and rent which are covered by the mortgage. Its reference to that instrument—"except as specifically permitted by the terms of the mortgage or deed of trust"—is merely to exempt the foreclosure powers from the force of V(a). It does not purport to exclude unmortgaged assets. Manifestly it does not ban operating expenditures, for they are indispensable to any operation at all of the corporation; clearly it does not outlaw dividends from net earnings, for that would conflict with an express authoriza-

tion within the same charter. But with these exceptions it means precisely what it says—that without the approval of the preferred stockholder the corporation shall not assign, transfer, dispose of or encumber *any* of its property. Corroborative of this intention is the corporation's own inhibition, during the loan's term, against engaging in any other business or liquidating. This interpretation is also compelled by the purpose as well as by the letter of V(a); by this clause F.H.A. is simply again circumscribing the power of the corporation to draw off its money or alien its property.

With this pattern in mind—a design readily assented to and even avouched by the plaintiff corporations—article IV(b) no longer can be considered merely a permissive and cumulative provision for dividends. By the charter's bar of all other resources, net earnings are made the exclusive funds for dividends. Hence, the instant dividend distribution is obviously a violation of the charter.

This conclusion is but the effectuation of the intendment and plan of the Congress. It does not trap the mortgagor. That the loans were to be applied only to construction and incidental uses is emphatically implicit in the Act, the rules and regulations, the application for insurance, the loan agreement between the mortgagor and the mortgagee, and in the commitment for insurance. The Act measures the loan by "the necessary current cost" of the land and building, thus pinning the loan's use to the physical property; the rules and regulations, the application, and the commitment, of course, express the same restriction. The loan agreement is even more explicit on this head. In it the corporation expressly represents that the loan is to aid the borrower in the construction of a rental housing project. While the Commissioner is not a party to the loan agreement, it was presented to F.H.A. to obtain the insurance, it is inextricably tied into the insurance plan, it is the base of the insurance commitments accepted by the plaintiffs, and it is embraced by the mortgages.

Suppose, as the plaintiffs urge, the sum paid in dividends is the unexpended portion of the percentages allowed for architects' fees and builders' profits; and suppose, as they contend, the sum evidences an economy of efficiency in building. Still, neither of these warranted the absorption of the sum in dividends while the corporation's funds were by its consent under the Commissioner's control. However, these savings are still secured to the owners, represented in the value of the project. True, the corporation might have lavished these moneys on the project, but the corporation would have been so much the loser. Another suggestion in argument, that the money could have been applied to salaries or other operating expenses, is hardly sound, for it would raise perplexing problems as to the use of capital for current operations and have doubtful tax effects. In any event, neither possibility would oust the preferred stockholder's control of the moneys after they were not so expended. Were the borrower a person and not a corporation, the result would not be different; for undoubtedly he would be restrained by contract just as the corporate borrower is now restrained by its charter. As the court sees it, the infirmity of the plaintiffs' position in this case is that they appraise the rights of the corporation and its common stockholders purely objectively, without regard to its peculiar status in the circumstances here.

Reappraisal of the properties did not change the character of the coin in hand. Though thereafter termed surplus, it remains insured mortgage money; and certainly it never has become net earnings. Payment of the residual moneys to the mortgagor was not a release of the money for any use; with the Commissioner in control, the money was simply put under his supervision. Nor is the default the less because the mortgagor is still liable for this money, as a part of the principal of the notes, or because the mortgagee and its insurer still have the full property security which the mortgages originally contemplated; for the dividend distribution did weaken the loan. It pro tanto lessened the direct financial responsibility of the borrowers upon the notes and mortgages—a danger the charter was framed to avoid and a real consideration in view of the extensive term of the loan, thirty-four years. Again, the dividend diversion is not excused by the mortgage's limitation upon any additional curtailment of the indebtedness. It is noteworthy, however, that the limiting clause only penalizes anticipatory payments when they are above fifteen per centum per annum of the original amount secured.

The court is not impressing a trust upon the excess mortgage funds in favor of the mortgagee or insurer; it is not doubting the corporation's ownership of the money; and it is not questioning the corporation's ultimate right to them. But it is holding that the disbursement of these moneys to the stockholders during the existence of the mortgage thwarted that control which, by agreement of the borrower, had been vested in the Commissioner for F.H.A.'s protection; the court is holding also that the use of the funds as dividends seriously offended the charter and the intent of the Congress. These violations abundantly justify the move of the Commissioner to choose new directors.

As the facts in these cases reveal that the corporations bound themselves not to use for dividends any funds other than net earnings, and as the funds used were concededly not net earnings, the court does not have before it the questions of what assets are available under the Virginia law for dividends and whether in Virginia dividends may be paid from unrealized appreciation of capital assets. But it is worth observing, by the way, that when creditors are affected, dividend distributions are not treated with the same liberality accorded them in inter-stockholders controversies. See, Judge Dobie in United States v. Riely, 4 Cir., 1948, 169 F.2d 542, 543. In regard to the corporate by-laws' reference to the Virginia statute which al-

lows payment of dividends from net assets, the court holds that the by-laws do not enlarge or otherwise modify the charter articles limiting dividends to net earnings. The by-law on its face is operative only to the extent that a contrary provision is not found in the charter.

■ II. The Commissioner is not chargeable with laches; he has acted with reasonable promptness under the circumstances. But if there has been delay, the plaintiffs have not thereby been led to act or change their position to their prejudice. The plaintiffs also aver that the statute of limitations would now bar any effort by the corporations to retake the dividends, and therefore the court would be granting only academic relief to the Commissioner in permitting him to install new directors preparatory to actions by the corporations for recovery of these moneys. This plea of the statute is not appropriate at this time.

■ The evidence does not establish an estoppel precluding the Commissioner from moving against the corporations. His request of them for, and his receipt from them of, an annual dividend of $5 each upon his preferred stock does not constitute a concurrence in the dividend distribution. A preponderance of the evidence does not prove that he was then acting with full knowledge of the source of the dividend. If a dividend had been declared, he was required to collect the amount due on the preferred stock. In doing so he is not presumed to have upheld the legality of the distribution.

■ At all events, no approval or assent given by a representative of the Administration can estop the Administration or the United States from seeking to rescind any unauthorized action detrimental to the agency or the United States, such as the payment of the dividends now in litigation—the Administration has been put in the position of insuring the repayment of moneys now in the enjoyment of the stockholders.

The court will adopt this memorandum as its findings of fact and conclusions of law, and it is entering an order dismiss-

ing these actions, but staying the dismissal and maintaining the present injunctive or agreed suspension of the Commissioner's intended actions for a period of 40 days to permit the plaintiffs to obtain an appeal and supersedeas to the order in the Court of Appeals for the Fourth Circuit, if they be so advised.