The **DARLINGTON, Inc., Plaintiff,**

v.

**FEDERAL HOUSING ADMINISTRA-
TION, Defendant.**

No. 4741.

United States District Court
E. D. South Carolina
Charleston Division.

June 20, 1956.

J. C. Long, Charleston, S. C., Heman H. Higgins, Jr., Georgetown, S. C., for plaintiff.

Arthur G. Howe, Asst. U. S. Atty., Charleston, S. C., Carl Eardley, Asst. Atty. Gen., Civil Division, Dept. of Justice, Washington, D. C., for defendant.

HOFFMAN, District Judge.

This is an action by way of declaratory judgment instituted by plaintiff (hereinafter called Darlington) against defendant (hereinafter referred to as F. H. A.) seeking a declaration of Darlington's rights to lease certain apartments in a multifamily apartment building owned by it for periods of less than 30 days. The defendant, acting by and through Norman P. Mason, Commissioner of Federal Housing Administration, requests dismissal of the action and affirmative relief by way of an injunction requiring Darlington to cease and desist in such practices. No issue is raised as to the failure to name the Commissioner as an original defendant; the Commissioner having waived this point in his pleadings. Defendant's motion to dismiss under Rule 12(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A., was converted into a motion for summary judgment under Rule 56, thus enabling the Court to consider evidence presented by both parties and dispose of the entire controversy.

Darlington is a corporation organized and existing under the laws of South Carolina with its charter conforming in all respects to the requirements of F. H. A., the insurer of the mortgage placed upon this modern, completely air conditioned, twelve-story multifamily apartment building erected by Darlington in the City of Charleston, South Carolina. Plaintiff urges that the practices engaged in by F. H. A. promoting the construction of these apartment buildings financed under Title VI, § 608 of the National Housing Act,[1] as amended, should be considered by the Court in determining the equities involved, but there is no merit to this contention as the evidence discloses that the first application submitted was withdrawn due to the objection of certain F. H. A. officials as to the location of the project. Thereafter, a subsequent application was approved upon the insistence of Darlington's sponsors. That an error of judgment was made in the selection of a suitable location is rather obvious under the circumstances, but this affords no reason to penalize the defendant.

This is not a matter involving so-called windfall profits which became so prevalent under loose and questionable practices in the years following the termination of World War II. Plaintiff's sponsors caused land, valued at $125,000, to become a part of the project. It has been stated that the total cost of the building was $1,550,920.11 which, when added to the land value, makes a total project cost of $1,675,920.11. F. H. A. insured a mortgage to the extent of $1,357,700, thus leaving an investment of $318,220.11 on the part of plaintiff. While it is improbable that this represents a total cash outlay by plaintiff, it is nevertheless conceded that the amount of the mortgage is approximately 90% of the total cost of the building and well within the legitimate financing of "608 projects".

During the latter part of 1949 the "608" application was approved and, on December 7, 1949, a charter was granted to plaintiff by the Secretary of State of South Carolina. As heretofore noted, the charter was in accordance with a form prescribed by F. H. A. and contains, among other features, certain pertinent provisions as follows:

"* * * So long as any property of this corporation is encumbered by a mortgage or deed of trust insured by the Federal Housing Commissioner *it shall engage in no business other than the construction and operation of a rental housing project or projects.*

\* \* \* \* \*

1. National Housing Act, approved June 27, 1934, 48 Stat. 1246, as amended by addition of § 608, May 26, 1942, 56 Stat. 303, and as thereafter amended, 12 U.S.C.A. §§ 1701, 1743.

"(e) In the event of any default by the corporation, as hereinafter defined, and during the period of such default, the holders of the Preferred Stock (F. H. A.), voting as a class shall be entitled to remove all existing directors of the corporation, and to elect new directors in their stead; provided, however, that one of said directors shall be the owner or holder of one or more shares of common stock. When such default or defaults shall have been cured, the right to elect directors shall again vest in the holders of the common stock.

\* \* \* \* \*

"Seventh: (a) The happening of any of the following events shall constitute a default within the meaning of that word as used in this certificate: (1) the failure of the corporation to have dismissed within thirty days after commencement, any receivership, bankruptcy or other form of liquidation instituted by or against the corporation; (2) the failure of the corporation to pay the principal, interest, or any other payment due on any note, bond or other obligation executed by it, as called for by the terms of such instruments; (3) the failure of the corporation to establish and maintain the reserve fund for replacements provided for in Article Fifth, Section (d) hereof or the use of such fund except as permitted in said section; (4) *the failure of the corporation, continuing for a period of fifteen days, to perform any of the covenants, conditions or provisions required by it to be performed by this certificate, the by-laws of the corporation, the mortgage, or any contract to which the corporation and the Commissioner shall be parties,* or fail to carry out in full the terms of any agreement whereby the loan covered by the insured mortgage is to be advanced or the project is to be constructed and operated.

"(b) In the event the mortgagor is in default under the terms of this certificate of incorporation or has failed to perform the covenants required by it to be performed under the terms of this certificate or by any mortgage insured by the Commissioner, the Commissioner may require the corporation to furnish at the expense of the corporation a complete audit of its books of account duly certified by a certified public accountant.

\* \* \* \* \*

"Eighth: *The following provisions are hereby adopted for the conduct of the affairs of the corporation and in regulation of the powers of the corporation,* the directors and the stockholders.

"(a) (1) Dwelling accommodations of the corporation shall be rented at a maximum average rental per room per month fixed by the Board of Directors of the corporation and approved by the holders of the Preferred Stock. A schedule of rentals for the reasonable rental value of each apartment based upon the average as so determined shall be filed with the holders of the Preferred Stock, prior to leasing or offering for lease of any of the dwelling accommodations of the project and when approved by them, shall thereafter be maintained except as provided in Article Sixth hereof. *Dwelling accommodations of the corporation shall not be rented for a period in excess of three years* nor shall the property be rented as an entirety without prior written approval of the Preferred Stockholders. Store accommodations shall be rented at a rental to be fixed by the directors with the prior written approval of the holders of the Preferred Stock. (2) The corporation shall have the right to charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between

tenant and the corporation with the written approval of the holders of a majority of the shares of Preferred Stock, for any facilities and/or services which may be furnished by the corporation to such tenant upon his request, over and above the facilities and services to which such tenant may be entitled by virtue of his lease, including, among other things, telephone operator and switchboard services, electric current, gas, air cooling and conditioning and other additional or extraordinary facilities or services which may be furnished by the corporation in connection with the operation of such housing facilities.

"(b) The corporation shall maintain its accommodations and the grounds and equipment appurtenant thereto in good and substantial repair and condition; provided, that in the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money deriving from any insurance on the property shall be applied in accordance with the terms of the insured mortgage on the premises.

"(c) The corporation, its property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents and other papers relating thereto shall be subject to examination and inspection at any reasonable time by the Commissioner or his duly authorized agents; the corporation shall keep full and complete copies of all written contracts or other instruments which affect it or any of its property, all or any of which may be subject to inspection and examination by the Commissioner or his duly authorized agents.

"(d) The books and accounts of the corporation shall be kept in accordance with the uniform system of accounting prescribed by the holders of the Preferred Stock.

"(e) The corporation shall furnish the Commissioner within 60 days following the end of each fiscal year a complete annual financial report.

"(f) At the request of the Commissioner, or of the holder of a majority of shares of the Preferred Stock, his or their agents, employees or attorneys, the corporation shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contracts, operation and condition of the property and the status of the insured mortgage and any other information with respect to the corporation or its property which may be requested."

From a casual reading of the foregoing, it is apparent that the charter is not the constitution of an independent corporation and that the preferred stockholder (F. H. A.) is not just a shareholder. Loftus v. Mason, D.C., 139 F.Supp. 207, an opinion by District Judge Bryan, Eastern District of Virginia, rendered February 10, 1956. The pertinent question is the extent of the broad powers granted to F. H. A. under the charter, the by-laws, the mortgage, and any contract to which the Commissioner and the corporation are parties. In the main, the Court is of the opinion that the documents referred to are essentially to protect the financial obligation of F. H. A. as an insurer of the mortgage, but are not so far-reaching as to restrict the right to lease individual apartments for periods of less than 30 days.

The financial structure of Darlington is, as one would already assume, grounded upon the issuance of 100 shares of preferred stock at a par value of $1 per share, all of which is owned and held by F. H. A. The 1,999 shares of common stock are held as follows: the Long Corporation—1,996 shares; L. D. Long—1 share; Leonard L. Long—1 share; T. E. Steadman—1 share. In turn, the Long Corporation is solely controlled by L. D.

Long; certain others hold qualifying shares for voting purposes. From this it will be seen that L. D. Long controls the plaintiff corporation.

The mortgage, mortgage note, and building loan agreement were executed by plaintiff on December 7, 1949, and, after some slight delay, the transaction was consummated on December 30, 1949. On the reverse side of the mortgage note in the sum of $1,357,700 appears the following language:

"Insured under Section 608 of the National Housing Act and Regulations thereunder of the Federal Housing Commissioner in effect on December 30, 1949.

To the extent of advances approved by the Commissioner.
Federal Housing Commissioner
By H. E. Bailey
 Authorized Agent
Date, December 30, 1949."

It is conceded by F. H. A. that, as of December 30, 1949, no specific provision of the charter, by-laws, mortgage, mortgage note, or any rule or regulation of F. H. A., restricted the right of plaintiff to lease apartments in its project for periods of less than 30 days. In fact, the only period of limitation appears in the charter where it is said:

"Dwelling accommodations of the corporation shall not be rented for a period in excess of three years nor shall the property be rented as an entirety without prior written approval of the Preferred Stockholders."

It is significant that F. H. A. saw fit to impose a maximum rental period but overlooked what is now the partial subject of this controversy.

The project was completed in July, 1951; the first day of occupancy being July 27. By October 9, 1951, only 70 of the 156 apartments had been rented. As the project analysis contemplated a 7% vacancy, the plight of Darlington was inevitable. With no capital to purchase furniture for any of the apartments, the Long Corporation provided same and, from October 9, 1951, to February 21, 1952, furniture was provided in certain apartments rented for 30 days or more. Beginning February 21, 1952, plaintiff rented furnished apartments to tenants for periods of less than 30 days, as well as in excess thereof. This practice has been increasingly remunerative to the point that, for the first 6 months of 1955 (the last period under consideration by the Court), plaintiff showed an operating profit as contrasted with net operating losses for all prior periods.

Darlington secured approval of its maximum average rental per room per month on September 13, 1951. There is no contention that plaintiff has charged in excess of this schedule unless the charge for furniture is considered. Plaintiff has not requested an approval of rentals for furnished apartments as F. H. A. has taken the position that such approval will not be given unless Darlington executes a letter agreeing not to lease any portion of the premises to any person for less than 30 days. F. H. A. first directed plaintiff's attention to the matter of furnished apartments and the agreement necessary to secure approval of a furnished apartment schedule by letter dated December 5, 1952. Apparently F. H. A. was not disposed to force the issue at that time but awaited the passage of the Housing Act of 1954, Public Law 560, 83rd Congress, Chapter 649, 2nd Session, H.R. 7839, 12 U.S.C.A. § 1731b.[2] The subject was thereafter

---

2. The pertinent portions of the Housing Act of 1954 are quoted at length as follows:

"Sec. 513. (a) The Congress hereby declares that it has been its intent since the enactment of the National Housing Act that housing built with the aid of mortgages insured under that Act is to be used principally for residential use; and that *this intent excludes the use of such housing for transient or hotel purposes while such insurance on the mortgage remains outstanding.*

"(b) Notwithstanding any other provisions of this Act, no new, existing, or rehabilitated multifamily housing with respect to which a mortgage is insured under this Act shall be operated for tran-

brought to life by letter of F. H. A. to plaintiff dated January 4, 1955, which did not make reference to the Housing Act of 1954. In reply, Darlington made a fair disclosure of its operations as to furnished apartments and inquired as to what provisions of law or charter prohibited the renting of apartments for a period of less than 30 days. Plaintiff's letter was referred to defendant's Deputy Assistant Commissioner who, in turn, then directed plaintiff's attention to the Housing Act of 1954. The present action followed this exchange of correspondence.

The rather unique method employed by plaintiff in handling the rental of furnished apartments is the proper subject of close scrutiny. A party seeking one-night occupancy at The Darlington is accepted, directed to his room, and, upon leaving, is given a receipt (by way of illustration) in the sum of $6 with only plaintiff's name printed thereon. In the lower left corner of this receipt appears appropriate spaces for the allocation of the $6 as to rent, telephone, and "furniture rent". Plaintiff thereupon takes the copies of the receipt and credits one-thirtieth of the maximum average rental per room per month to the item "rent", with the balance being allocated to "furniture rent". For example, the sum of $2.58 would be charged to "rent" and $3.42 to "furniture rent". At least monthly the "furniture rent" credits

---

sient or hotel purposes unless (1) on or before May 28, 1954, the Commissioner agreed in writing to the rental of all or a portion of the accommodations in the project for transient or hotel purposes (in which case no accommodations in excess of the number so agreed to by the Commissioner shall be rented on such basis), or (2) the project covered by the insured mortgage is located in an area which the Commissioner determines to be a resort area, and the Commissioner finds that prior to May 28, 1954, a portion of the accommodations in the project had been made available for rent for transient or hotel purposes (in which case no accommodations in excess of the number which had been made available for such use shall be rented on such basis).

"(c) Notwithstanding any other provisions of this Act, no mortgage with respect to multifamily housing shall be insured under this Act (except pursuant to a commitment to insure issued prior to the effective date of the Housing Act of 1954), and (except as to housing coming within the provisions of clause (1) or clause (2) of the preceding subsection) *no mortgage with respect to multifamily housing shall be insured for an additional term, unless (1) the mortgagor certifies under oath that while such insurance remains outstanding he will not rent, or permit the rental of, such housing or any part thereof for transient or hotel purposes,* and (2) the Commissioner has entered into such contract with, or purchased such stock of, the mortgagor as the Commissioner deems necessary to enable him to prevent or terminate any use of such property or project for transient or hotel purposes while the mortgage insurance remains outstanding.

"(d) The Commissioner is hereby authorized and directed to enforce the provisions of this section by all appropriate means at his disposal, as to all existing multifamily housing with respect to which a mortgage was insured under this Act prior to the effective date of the Housing Act of 1954 as well as to all multifamily housing with respect to which a mortgage is hereafter insured under this Act: *Provided,* That no criminal penalty shall, by reason of enactment of this section, be applicable to the rental or operation of any such existing multifamily housing in violation of any provision of subsection (b) of this section at any time prior to the effective date of the Housing Act of 1954.

"(e) As used in this section, (1) the term 'rental for transient or hotel purposes' shall have such meaning as prescribed by the Commissioner but rental for any period less than thirty days shall in any event constitute rental for such purposes, and (2) the term 'multifamily housing' shall mean (i) a property held by a mortgagor upon which there are located five or more single family dwellings, or upon which there is located a two-, three-, or four-family dwelling, or (ii) a property or project covered by mortgage insured or to be insured under section 207, under section 213 with respect to any property or project of a corporation or trust of the character described in paragraph numbered (1) of subsection (a) thereof, under section 220 if the mortgage is within the provisions of paragraph (3) (B) of subsection (d)

are paid to Long Corporation, the owner of the furniture. This rather ingenious scheme is a mere subterfuge and the Court has no patience with same. Furthermore, Long Corporation pays no rent to plaintiff for the apartments in which its furniture remains, whether occupied or not. It may be argued that the availability of furnished apartments promotes the rentals, but F. H. A. admittedly controls the rental schedule on both furnished and unfurnished apartments. While the Court concludes that F. H. A. cannot prohibit the leasing of apartments for periods of less than 30 days, and cannot insist upon any agreement to desist from such practice, it is nevertheless true that F. H. A. controls the maximum rentals at all times and an injunction must issue against plaintiff prohibiting the leasing of furnished apartments for any period of time until and unless a schedule has been duly approved; the injunction to become operative after F. H. A. has approved a fair and reasonable rent schedule for furnished apartments which need not coincide with any monthly schedule heretofore approved. Whether Darlington is the owner of the furniture is immaterial as the rental of the apartment, furnished or unfurnished, is an integral part of the entire operation.

 A study of the National Housing Act enacted June 27, 1934, 48 Stat. 1246 (1934), together with numerous amendments and additions thereto, with particular reference to Title VI, § 608, leads to the inevitable conclusion that it

thereof, under section 221 if the mortgage is within the provisions of paragraph (3) of subsection (d) thereof, under section 608, under section 803, or under section 908, or (iii) a project with respect to which an insurance contract pursuant to title VII is outstanding.

"(f) Promptly after receipt of written notice that any portion of any building is being rented or operated in violation of any provision of this section or of any rule or regulation lawfully issued thereunder, the Commissioner shall investigate the existence of the facts alleged in the written notice and shall order such violation, if found to exist, to cease forthwith.

"(g) If such violation does not cease in accordance with such order, the Commissioner shall forward the complaint to the Attorney General of the United States for prosecution of such civil or criminal action, if any, which the Attorney General may find to be involved in such violation.

"(h) Whenever he finds a violation of any provision of this section has occurred or is about to occur, the Attorney General shall petition the district court of the United States or the district court of any Territory or other place subject to United States jurisdiction within whose jurisdictional limits the person doing or committing the acts or practices constituting the alleged violation of this section shall be found, for an order enjoining such acts or practices, and upon a showing by the Attorney General that such acts or practices constituting such violation have been engaged in or are about to be engaged in, a permanent or injunction or restraining order, shall be temporary injunction, restraining order, or other order, with or without such granted without bond.

"(i) Any person owning or operating a hotel within a radius of fifty miles of a place where a violation of any provision of this section has occurred or is about to occur, or any group or association of hotel owners or operators within said fifty-mile radius, at his or their sole charge or cost, may petition any district court of the United States or the district court of any Territory or other place subject to United States jurisdiction within whose jurisdictional limits the person doing or committing the acts or practices constituting the alleged violation of this section shall be found, for an order enjoining such acts or practices, and, upon a showing that such acts or practices, constituting such violation have been engaged in or are about to be engaged in, a permanent or temporary injunction, restraining order, or other order, with or without such injunction or restraining order, shall be granted.

"(j) The several district courts of the United States and the several district courts of the Territories of the United States or other place subject to United States jurisdiction, within whose jurisdictional limits the person doing or committing the acts or practices constituting the alleged violation shall be found, shall, wheresoever such acts or practices may have been done or committed, have full power and jurisdiction to hear, try, and determine such matter under subsections (h) and (i) of this section."

was the intent of Congress to provide housing accommodations on the mortgaged property *designed principally for residential use.* It is so stated in the Administrative Rules and Regulations of F. H. A. in existence as of the date of the insuring of the mortgage herein. F. H. A. insists that the word "principally" was intended to permit insurance of apartments on which commercial facilities were planned, such as drug counters, snack bars, etc. Plaintiff advances the theory that the word "principally" necessarily implies a right to rent to so-called transients, and argues that the doctrine of *expressio unius est exclusio alterius* is applicable. In any event the word "principally" cannot be construed to mean "exclusively". It is not for this Court to delete or distort the words of Congress or the Commissioner. 62 Cases, etc. v. United States, 340 U.S. 593, 71 S.Ct. 515, 95 L.Ed. 566; 82 C.J.S., Statutes, § 312, p. 530. Does the leasing of certain apartments for periods of less than 30 days alter the words "principally for residential use"? The Court does not believe that such an arrangement violates the intent of Congress when all factors mentioned herein are taken into consideration.

There has been no contention that plaintiff has failed to give preference to war workers and veterans, or has discriminated against families with children. These are requirements of the Act, but are not in issue. It is conceded that no person entitled to priority has ever been rejected, and no one desiring so-called "permanent" occupancy of an apartment has been required to wait any time to obtain same. While these provisions tend to support the view that this multifamily apartment was designed "principally for residential use", it may also be argued that the interpretation now requested by F. H. A. could have the effect of depriving a veteran of the preference granted to him by Congress in the event he wished to occupy an apartment for a period of less than 30 days.

As the emergency created by returning veterans of World War II came to an end, the demand for multifamily apartments in certain areas was materially reduced. Faced with the necessity of maintaining mortgage payments, reserves for depreciation, operating expenses, etc., mortgagors sought other means of income in order to protect their investments. Furnished apartments proved to be an incentive for rentals and apparently F. H. A. has approved of such methods, thereby permitting a reasonable number of apartments to be rented on schedules duly submitted and approved. It is admitted that, prior to the passage of the Housing Act of 1954, F. H. A. granted permission in from 12 to 15 projects to rent for periods of less than 30 days, the right of which is contended to be under F. H. A.'s broad power of control of "methods of operation". When the attention of the American Hotel Association was directed to instances of so-called transient rentals, a stern protest was registered which ultimately brought about the enactment of the Housing Act of 1954. The plaintiff herein does not advertise as a hotel, has no license as such, and no signs appear indicating its willingness to accept transients. Contrary to the contention of plaintiff, any such action would, in the opinion of the Court, violate that provision of the charter which prohibits engaging in any business other than the operation of a rental housing project. But the mere acceptance of transients as tenants does not, in and of itself, convert a rental housing project into a hotel. During March, 1955, there were 121 individual instances of rentals for less than 30 days, of which 48 remained one day, 22 for two days, 12 for three days, 20 for seven days, etc. As March may be considered generally as the season of greatest demand for transients in Charleston, it is not unlikely that the figures quoted above give the largest illustration of so-called transient rentals. For that month there appeared to be an average of 15 furnished apartments rented, or available for rent, for periods of less than 30 days. This is tantamount to approximately ten per centum of the entire available occupancy.

This Court is not of the opinion that a ten per cent rental allocation for persons desiring space for periods of less than 30 days is the equivalent of converting the project into a hotel when unaccompanied by any act of advertising for transients as a hotel. While the factual situation is somewhat different, this Court leans to that part of the opinion in People ex rel. Waitt v. Goldfogle, 121 Misc. 341, 201 N.Y.S. 262, 264, where it is said:

> "The mere fact that a building constructed and operated as a hotel in the common acceptance of that term may be occupied by a few tenants on long leases would certainly not change the character of the building as a whole. The converse is true here. The rooms occupied by transients, forming but 20 per cent. of the total number of rooms, are being so used only temporarily, in order to derive an income therefrom pending attempts to lease them for long terms, like the rest of the rooms. Even the 'transient' rooms are charged for by the room, and not by the number of persons who may occupy them. The building is without any of the public rooms or public accommodations usually associated with the idea of a hotel. Under these circumstances I think that the building is to be regarded as having maintained its original character of an apartment house, unaffected by the casual fact that some of the rooms are temporarily devoted to purposes which have some of the elements of hotel accommodation."

The unusual situation created by reason of F. H. A.'s insistence to cease the practice of renting apartments for periods of less than 30 days will admittedly necessitate the financial downfall of Darlington, with the resultant loss of an initial investment, together with the monthly payments of $6,222.79 each, beginning June 1, 1951, as well as a reserve account, etc. It certainly would not justify the continued existence of Darlington and bankruptcy would be the ultimate answer. A foreclosure of the mortgage would follow with the Commissioner of F. H. A. acquiring title as it is a fair assumption that no purchaser at said sale would bid an amount equal to, or in excess of, the unpaid balance due on said mortgage. The mortgagee is obligated to acquire title under such circumstances and assign that title to the Commissioner who, in turn, sells the property without regard to any limitation as to use, etc., unless, of course, F. H. A. insures a new mortgage on the project. The result is that a foreclosure is likely to bring about a hotel with its right to advertise and operate as such—the mortgagor would lose its investment—F. H. A. would undoubtedly be called upon to pay a substantial sum by reason of its insurance obligation to the mortgagee—and no one would profit.

The position of the American Hotel Association is not without merit. Investments in hotels are substantial and such enterprises have been without the aid of 90% to 100% financing guaranteed by an agency of the United States. The promotion of motels has made serious inroads on operation of hotels. It may be readily understood why the Hotel Association exerted its efforts to persuade Congress to pass the Housing Act of 1954, thus defining transient rentals and prohibiting leases in F. H. A. insured projects for periods of less than 30 days. As to projects committed subsequent to the passage of the 1954 Act, there can be no question as to its constitutionality or applicability. But with respect to projects already in operation, this Court has concluded that the Housing Act of 1954 is ineffective as, under the circumstances, it cannot be made retroactive. A careful study of the 1954 Act will illustrate that plaintiff's right to lease for periods of less than 30 days undoubtedly existed prior to that date despite the primary intent of Congress. Under what theory, then, may Congress take away that right which is not, in itself, contrary to any law, rule, or regulation? This case does not involve the exercise of police power, war powers, zoning laws, tariff laws, export and import licensing, emer-

gent or tax legislation—all of which have, in one form or another, upheld the validity of retroactive legislation. When the United States enters into contractual relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals. Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434. As was said in Union Pacific Railway Co. v. United States, 99 U.S. 700, 25 L.Ed. 496, 504:

> "The United States cannot any more than a State interfere with private rights, except for legitimate governmental purposes. They are not included within the constitutional prohibition which prevents States from passing laws impairing the obligation of contracts, but equally with the States they are prohibited from depriving persons or corporations of property without due process of law. They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad. Neither can they by legislation compel the corporation to discharge its obligations in respect to the subsidy bonds otherwise than according to the terms of the contract already made in that connection. The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen. No change can be made in the title created by the grant of the lands, or in the contract for the subsidy bonds, without the consent of the corporation. All this is indisputable."

To the same effect, see Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 17 U.S. 518, 4 L.Ed. 629. Even if it could be successfully argued that plaintiff had no vested right to lease an apartment for a period of less than 30 days, the effect of the Housing Act of 1954 undoubtedly attempts to create a new obligation with respect to a past transaction and hence must fail. 16A C.J.S., Constitutional Law, § 417, p. 99. To open an avenue for retroactive or retrospective laws in the field of contract not dealing with police, war, or emergent powers, would have a very serious effect in the commercial world which has become so involved with government financing and other related subjects. In substance, there must be a stopping point somewhere, and this appears to illustrate the dangers involved where Congress has yielded to the requests of a third party with knowledge that there will be a financial loss to the mortgagor and, to a limited extent, the taxpayers.

 It is the duty of the Court to determine the intent of Congress as to the meaning of any law passed. Stockdale v. Insurance Companies, 20 Wall. 323, 87 U.S. 323, 22 L.Ed. 348; Town of Koshkonong v. Burton, 104 U.S. 668, 26 L.Ed. 886. The expressions of the members of the legislative body are entitled to respect and consideration in determining what the rule or law was at the time of passage, but if the Court is reasonably satisfied that the later expression or construction is erroneous, the same should be disregarded. It is interesting to note that, at the time of the hearings on the Housing Act of 1954 before the Senate Committee on Banking and Currency, Senator Capehart, who presided over the meeting, said:

> "I didn't write the law, it was written back in 1940. I wasn't here, so I can't tell what the intention was."

While it may be assumed that some members of Congress in 1954 were also members in 1940, and even in 1934 when the original National Housing Act was passed, there is no affirmative intimation of Congressional intent other than from the wording of the 1954 Act and the Committee reports. In truth and in fact, the question now under consideration was never given a thought. In the desire of

Congress to fulfil the need for housing, only such matters as the needs of war workers, veterans, families of veterans, and the customary soundness of the transaction from a financial standpoint with its attendant restrictions were the subject of legislation and intention.

If the Administrative Rules and Regulations for Rental Housing Insurance under Section 608 of the National Housing Act, as amended May 22, 1946 (which Rules and Regulations were in existence at the time of the commitment, insurance and construction of the Darlington project), are to be given any effect as to the intent of Congress prior to 1954 or as to the final determination of this case, it is abundantly clear that there was no intention to thereafter create a new obligation with respect to a past transaction assuming, of course, that the operation by the mortgagor was not per se unlawful. Article VIII of said Rules and Regulations covering the matter of "Amendments" states:

> "These Regulations may be amended by the Commissioner at any time and from time to time, in whole or in part, *but such amendments shall not affect the contract of insurance on any mortgage already insured* or any mortgage or prospective mortgage on which the Commissioner has made a commitment to insure."

At the time hearings were conducted before the Senate Committee on Banking and Currency in March, 1954, Mr. Arthur J. Packard, Chairman of the Board of the American Hotel Association, made this pertinent statement:

> "As I mentioned before, we have tried for four or five years to achieve an administrative solution to this problem. Officials of FHA have generally been quite sympathetic. Section 1743(b) (1), in connection with section 608 properties, gave the Administrator authority to regulate rents, charges, and methods of operation. But counsel for the FHA has viewed narrowly this authorization. He contends that it does not confer power upon the agency to impose regulations after the eligibility of the mortgagor has been approved. At the outset, the agency always required approval of all rent schedules. And these were normally expressed in monthly rentals. But FHA counsel now takes the position that if one of these apartment buildings rents a room overnight for not more than one-thirtieth of the approved monthly rental, the agency has no basis for prohibiting the operator from maintaining such practice." (Pages 656, 657. Hearings before Senate Banking and Currency Committee on Housing Act of 1954.)

The statement of Mr. Packard is questioned by the testimony of the Director of the Legal Division of F. H. A. as being somewhat erroneous, but the fact that F. H. A. apparently did not resort to any legal process in an effort to bring about a cessation of such practices affords a fair assumption that the interpretation placed thereon by the Administrative Agency was at least doubtful.

It is true that the Commissioner has always retained the authority to regulate rents, charges, and "methods of operation". This is so specified in the Act. 12 U.S.C.A. § 1743(b) (1). What, then, is the meaning of the words "methods of operation"? Should it be given a broad interpretation which would, in effect, grant to F. H. A. the rights ordinarily reserved to an owner of real estate? The answer to these inquiries may be found in the interpretation placed thereon by F. H. A. In a bulletin entitled "Multifamily Rental Housing Insurance" revised August 13, 1954, providing for the Administrative Rules and Regulations under Section 207 of Title II of the National Housing Act, 12 U.S. C.A. § 1713 (the forerunner and successor of Section 608), the Commissioner significantly points out what is meant by the term "methods of operation". Reg. § 232.19(f). Without quoting verbatim what is contained therein under "methods of operation", it is sufficient to state that, for the proper consideration of this

case, the items mentioned are substantially the same as the items referred to in Darlington's charter subsequent to the words, "The following provisions are hereby adopted for the conduct of the affairs of the corporation and in regulation of the powers of the corporation, the directors and the stockholders". True, in the 1954 revision, a special clause was inserted in Reg. § 232.20(b) under the heading "Special certificates and contract to be executed by mortgagor", prohibiting the rental of any part of the property "for transient or hotel purposes", and further providing that the mortgagor's charter shall contain like provisions. This is potent evidence of the fact that, prior to 1954, it had never been the intention of F. H. A. or Congress to prohibit any practice of leasing for periods of less than 30 days, and, further, that the term "methods of operation" was not intended to include a like prohibition. If such is not the case, what would be the purpose of F. H. A. in requiring these specific provisions in corporate charters?

Assuming arguendo that plaintiff's stockholders had sold their stock in Darlington shortly after the completion of the project, how would any new owner of the capital stock ascertain that such an intent or regulation existed as now suggested by F. H. A.?

▆▆▆▆ It must be recalled that F. H. A. is in the insurance business and that Congress, in launching a governmental agency into the commercial world, endowed it with the authority to sue and be sued and contemplated that it would be treated as any private enterprise. Federal Housing Administration v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724. Similarly, it has been held that regulations promulgated by F. H. A. are to be construed against F. H. A. Ferguson v. Union National Bank, 4 Cir., 126 F.2d 753, an opinion by Chief Judge Parker; Garrison v. United States, 7 Wall. 688, 690, 19 L.Ed. 277. Adopting this rule of construction, there is no sound reason for arguing that plaintiff did not have a right given to it in the legitimate use and enjoyment of its property to rent a reasonable number of apartments for periods of less than 30 days. Furthermore, there is no magic in the selection of 30 days.

The Housing Act of 1954 discriminates against plaintiff in that it empowers the Commissioner to exclude the operation of the "transient rental" clause located in a resort area from the provisions of the Act if a portion of the accommodations in the project had been made available for rent for "transient or hotel" purposes prior to May 28, 1954. Through the efforts of Senator Smathers (Florida), this provision was inserted and, in effect, the entire State of Florida was designated as such. The "608 projects" in Florida and other resort areas were constructed under the same charter, mortgage, rules and regulations as was Darlington. Moreover, it will be noted that the sales promotion advanced by F. H. A. during the years following World War II and prior to the Korean War suggested to sponsors that mortgages could be refinanced or insured for additional terms if the same became necessary. While there is no legal obligation upon F. H. A. to insure for an additional term, the Housing Act of 1954 effectively forecloses this possibility as to all multifamily housing projects except those which are excluded by reason of being situated in resort areas.

Additionally, Congress apparently was uncertain as to its right to legislate retroactively when it inserted in the 1954 Act the words:

> "*Provided*, That no criminal penalty shall, by reason of enactment of this section, be applicable to the rental or operation of any such existing multifamily housing in violation of any provision of subsection (b) of this section at any time prior to the effective date of the Housing Act of 1954."

That the 1954 Act is designed to afford relief for private interests, as distinguished from public purposes, is further evidenced by the clause which grants a right to any person owning or operating a hotel within a radius of fifty miles

from the "project" to institute an action in the appropriate District Court enjoining the alleged violation.

Even assuming the right of Congress to delegate the power to "regulate" to an administrative agency, the agency exercising such authority pursuant to contract will not be permitted to negate the plain words of the contract by adding regulations subsequent to the date the agency committed itself. Such authority would completely destroy the contract.

A decree will be prepared by counsel for plaintiff adjudicating its rights under the declaratory judgment action, stating in substance:

1. The defendant and its Commissioner have no right to prohibit the rental of a reasonable number of apartments in The Darlington for periods of less than 30 days, as long as priorities are maintained for the persons entitled thereto and no proper person desiring occupancy for a period of 30 days or more is thereby precluded from obtaining accommodations.

2. If any of said accommodations are furnished by plaintiff, or permitted to be furnished by plaintiff, said plaintiff shall promptly submit to defendant a proposed schedule of maximum average rentals (including furniture and other incidentals) and, if fair and reasonable under all the circumstances, defendant shall approve said schedule and plaintiff will thereupon be enjoined from making any rental charges, directly or indirectly, in excess of the approved schedule.

3. The defendant may not insist upon plaintiff's execution of any agreement to desist from renting for periods of less than 30 days as a condition precedent to the approval of a rental schedule for furnished apartments to be leased for periods of less than 3 years, irrespective of the minimum time of leasing.

4. The plaintiff has no right to advertise as a hotel or to advise the general public through any medium of advertising or letters of its willingness to accept so-called transients; nor may plaintiff obtain any license to operate as a hotel, or post any signs indicating its ability to accept any tenant for periods of any particular duration. No injunction need issue as to such matters as there is no contention that plaintiff is operating as such.

5. Both parties having prevailed herein to a limited extent, the taxable costs, including the expense of the original transcript of testimony taken at Charleston, South Carolina, and Norfolk, Virginia, shall be equally divided.

6. Should either party file a notice of appeal within the time permitted from the date of the entry of the decree to be submitted, the effectiveness of said decree will be stayed for a period of 40 days to permit the appealing party or parties to obtain an appeal to said decree in the Court of Appeals for the Fourth Circuit, if they be so advised.