Norman P. MASON, Commissioner of the Federal Housing Administration, Plaintiff,

v.

ROCK CREEK PLAZA, INC., Defendant.

Civ. A. No. 3017-55.

United States District Court
District of Columbia.

June 30, 1958.

George Cochran Doub, Asst. Atty. Gen., Carl Eardley, Max L. Kane, Attys., Dept. of Justice, Washington, D. C., Oliver Gasch, U. S. Atty., for plaintiff.

Frank L. Ball, Jr., Arlington, Va., Martin J. McNamara, Jr., Washington, D. C., for defendant.

MATTHEWS, District Judge.

This action was brought by Norman P. Mason, Commissioner of the Federal Housing Administration under Section 513 of the National Housing Act. 12 U.S. C.A. § 1731b. That section was added to the Act in 1954 as an amendment,[1] and states in pertinent part:

"The Congress declares that it has been its intent since the enactment of the National Housing Act that housing built with the aid of mortgages insured under that Act is to be used principally for residential use; and that this intent excludes the use of such housing for transient or hotel purposes while such insurance on the mortgage remains outstanding.

"Notwithstanding any other provisions of this Act, no new, existing, or rehabilitated multifamily housing with respect to which a mortgage is insured under this Act shall be operated for transient or hotel purposes unless * * * on or before May 28, 1954 the Commissioner has agreed in writing to the rental of all or a portion of the accommodations in the project for transient or hotel purposes (in which case no accommodations in excess of the number so agreed to by the Commissioner shall be rented on such basis) * *

"As used in this section, * * * the term 'rental for transient or hotel purposes' shall have such meaning as prescribed by the Commissioner but rental for any period less than thirty days shall in any event constitute rental for such purposes * * *."

The Commissioner is empowered by Section 513 to enforce its provisions.

The defendant, Rock Creek Plaza, Inc., a Maryland corporation, was organized to build a multifamily housing project at 3636—16th Street, Northwest, Washington, D. C., with the proceeds of loans guaranteed by the Federal Housing Administration under Section 608 of the National Housing Act.[2] The project is owned and operated by defendant and known as "The Woodner". All of its 1135 apartments have kitchen equipment and are suitable for permanent occupancy. However, defendant has made 246 of these apartments available for rental to transients on a night to night basis.

The plaintiff seeks a permanent injunction restraining the defendant from operating its project as a hotel, from renting any of the units in the project for any term less than one month until such time as the loans have been repaid and the Federal Housing Administration insurance terminated, and from charg-

1. National Housing Act, approved June 27, 1934, 48 Stat. 1246, as amended by addition of Section 513, August 2, 1954, 68 Stat. 610, 12 U.S.C.A. §§ 1701 et seq., 1731b.

2. National Housing Act, approved June 27, 1934, 48 Stat. 1246, as amended by addition of Section 608, May 26, 1942, 56 Stat. 303, and as thereafter amended, 12 U.S.C.A. §§ 1701 et seq., 1743.

ing rent for any unit in excess of the monthly rental schedule approved by the Commissioner of the Federal Housing Administration.

Under peculiar circumstances to be related hereinafter an agreement was entered into in August 1952 between the then Assistant Commissioner of the Federal Housing Administration and defendant whereby under certain conditions defendant was given permission to use 250 apartments in its project for transient rentals.

It is contended by plaintiff that such right as defendant had to rent to transients was based solely upon the aforementioned agreement, that defendant has breached the agreement in several ways hereinafter stated, and that because of such breaches plaintiff terminated the agreement in 1955. On this premise, plaintiff maintains that defendant by continuing to rent to transients is violating Section 513 of the National Housing Act, 12 U.S.C.A. § 1731b, which prohibits transient rentals in projects on which FHA insured loans are outstanding. On the other hand, defendant denies that its right to rent to transients is dependent upon the agreement, but asserts that if it is, the agreement is still in effect and that plaintiff's attempt to terminate it is unwarranted. Further, defendant maintains that its method of operation does not violate Section 513. It is argued that prior to adoption of Section 513 in 1954 there was no reserved power in the National Housing Administration to prohibit rentals for less than thirty days, and hence that it would be violative of due process to apply the prohibitions of that Section to projects completed before its enactment (as was defendant's project). Moreover, defendant claims that Section 513 exempts from its prohibitions the hotel and transient operations of The Woodner. This claim is grounded on the clause therein concerning accommodations which prior to adoption of Section 513 had been used for hotel and transient operations with the written consent of the Federal Housing Administrator.[3]

From the testimony, and exhibits in evidence, the court makes the following

### Findings of Fact

1. In February 1949, Rock Creek Plaza, Inc., hereinafter referred to as the defendant, filed applications for mortgage insurance under Section 608 of the National Housing Act for two projects, each being described as an "eight story apartment" with over 500 "family units".

2. Commitments of insurance were executed and issued to the proposed mortgagee in March 1949 by the Federal Housing Administration, hereinafter referred to as FHA. Under the terms thereof FHA undertook to insure loans made to defendant up to the amount of $9,897,300.

3. Thereafter the mortgagee loaned to the defendant said insured sum, which moneys were to be used for the construction of two apartment projects, located at 3636—16th Street, Northwest, Washington, D. C., described as Sections I and II. The two sections are separated by a strip of caulking compound one inch wide, and the entire project, known as The Woodner, is operated as a single unit.

4. As required by FHA the defendant adopted a model charter, the terms of which were, for the most part, prepared by FHA. Under the terms of this charter, the defendant's business activities were limited to the construction and operation of rental housing projects, the text in that regard being as follows:

"So long as any property of this corporation is encumbered by a mortgage or Deed of Trust insured by the Commissioner *it shall engage in no business other than the construction and operation of a Rental Housing Project or Projects.*" (Emphasis supplied.)

5. The charter further provided that FHA would control the rental schedules for all apartments in the project, and

---

3. National Housing Act § 513, 12 U.S.C.A. § 1731b (b).

defendant certified that "in selecting tenants for the property" it would "not discriminate against any family" by reason of their children.

6. Numerous provisions are in defendant's charter designed to give to FHA the right to police defendant's corporate activities for the protection of FHA as guarantor of the loans and for guarding against practices inconsistent with the purposes of the National Housing Act. No attempt will be made to detail these provisions but the following one sheds light on the issues here:

"The corporation shall not without prior approval of the holders of a majority of the shares of the preferred stock" (such holders being FHA) "require as a condition to the occupancy or leasing of any unit in the project the payment to or deposit with the corporation * * * of any amount other than the payment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease."

7. Under the National Housing Act, as first enacted in 1934 and consistently thereafter, it was the interpretation of FHA that insurance was not to be issued to projects which were used in any degree for transient rentals, and FHA issued directives to its field officers, commencing in 1938, prohibiting transient rentals in FHA projects.

8. The language "designed principally for residential use" appearing variously in the National Housing Act (although not in Section 608) and in the FHA regulations was interpreted by FHA to permit the insurance of dwellings or apartments, portions of which were designed for some commercial purpose for the benefit of the occupants of such housing, including garage space, beauty parlors, grocery stores, and the like.

9. The defendant applied to the District of Columbia for an excavation permit. After it was issued and with FHA's consent defendant commenced excavation. However, under FHA practice no advances to the contractor would be insured until the contractor produced a building permit from the local authorities, and proof that the property upon which the project was to be built was zoned for residential use.

10. When the defendant submitted its application for a permit to construct an apartment building, as required by the District of Columbia, it had furnished plans which indicated that it intended to use certain space within the building for commercial adjuncts. Under the then existing District of Columbia zoning regulations, a hotel license was required in accommodations which contained commercial adjuncts. Following the submission of the application for a permit to construct an apartment building, it was revised to show that the building was to be used for an apartment-hotel, and on or before September 26, 1949, a further application for permission to build projections beyond the property line was filed with the District of Columbia, showing that the building was to be used for an apartment-hotel.

11. Prior to the issuing of the building permit on October 7, 1949, defendant was fully apprised of the zoning requirements and intended to comply therewith by operating an apartment-hotel.

12. Under the practice of the District of Columbia, the building permit is not issued until after the various construction branches of the District of Columbia, such as plumbing, electrical, structural, etc., have approved the plans and have reflected their approval by a stamp on the application.

13. Under the practice of the District of Columbia, and in view of the plans and the applications on file, a building permit for an apartment-hotel should have been issued. If such a permit had been issued, the project would have become ineligible for FHA insurance under the existing policy and practice.

14. For reasons which are not explained, the District of Columbia issued a building permit for an apartment, even though at the time of issuance the plans had not been approved by all of the construction branches, and showed commercial adjuncts. This permit was then presented to FHA and the loan was endorsed for insurance.

15. In December 1949, the mortgagee noted the necessity for a hotel license and assumed that defendant would take the necessary steps to secure the same. In January 1950, the defendant filed an application with the Board of Zoning Adjustment of the District of Columbia for permission to operate commercial adjuncts in the project and submitted a plan indicating an intent to make 420 apartments available for transients. This application was approved by the Board of Zoning Adjustment, and permission was granted upon the condition that a hotel license be secured. At the time of this application, the excavation had been completed to the extent of 90% in Section I.

16. Plaintiff's first indication of the defendant's intention to conduct a hotel operation came in the summer of 1951 when FHA's local director heard a rumor that defendant had hired a hotel manager. At this time the local director advised defendant that hotel facilities and services were not contemplated under the National Housing Act.

17. It was not until January 1952 when the building was nearing completion, that defendant advised FHA of the necessity of securing a hotel license, if the commercial adjuncts were to be used, and of defendant's intent to operate as a hotel. This was plaintiff's first knowledge of the District of Columbia zoning requirement of a hotel license for housing accommodations containing commercial adjuncts.

18. Plaintiff refused to permit defendant to engage in transient rentals, and this refusal persisted until August 1952. Shortly before that Franklin Richards resigned as Commissioner of FHA, and he was quickly employed by defendant to secure permission to operate as a hotel, part of his fee being contingent upon his success.

19. In August 1952, the policy of FHA against transient rentals was reversed insofar as the defendant was concerned. An agreement was entered into whereby among other things (a) the defendant was not to advertise as a hotel; (b) defendant was not to use bellboys; (c) defendant might use 250 apartments for transient guests but was to cease transient operations whenever the District of Columbia zoning regulations were amended to permit the operation of commercial adjuncts without a hotel license. The agreement is indicated in two letters, one dated August 15, 1952,[4] from defendant to the Assis-

4. The text of the pertinent portion of defendant's letter to the Assistant Commissioner is as follows:

"Reference is made to our letter of August 1, 1952 addressed to Mr. Thomas C. Barringer, Director, District Insuring Office, Federal Housing Administration, Washington, D. C., wherein we request permission to provide occupancy of our project in the manner required by the District of Columbia governmental authorities so that we will be enabled legally to rent our commercial adjuncts as shown on the original drawings approved for building permit by the Building and Zoning Department of the District of Columbia and your Administration.

"Enclosed herewith you will find a copy of the applicable sections of the District of Columbia Zoning Regulations together with a copy of a letter received from the Board of Zoning Adjustment of the District of Columbia from which you will see that in order to accomplish the desired result it will be necessary for us to provide accommodations for 600 guests. As the result of numerous conferences with the District of Columbia Zoning Authorities it has been determined that the use of 250 apartments in our project for such purpose will be adequate to comply with these requirements.

"In order to induce your office to permit compliance with these District of Columbia regulations, we hereby represent and agree as follows:

tant Commissioner of FHA and the reply thereto dated August 22, 1952.[5] The terms of the agreement were not thereafter changed.

20. Defendant applied for and secured a hotel license, but from the outset the defendant violated its agreement, in that defendant has employed bellboys and has advertised in an effort to attract transient trade.

21. In 1954, the Board of Zoning Adjustment had under consideration an amendment to the zoning regulations which would permit some apartments to operate commercial adjuncts. This regulation was drafted by Mr. Robert O. Clouser, a member of the Board and Director of Planning for the District of Columbia. The regulation was drafted for the benefit of the defendant and another apartment known as the Berkshire. When the draft was prepared, Mr. Clouser conferred with Mr. James C. Wilkes who had been in the employ of the defendant as an attorney from the inception of the project. Mr. Wilkes suggested revising the draft for the purpose of making certain that the defendant's project would qualify and the language suggested by Mr. Wilkes was adopted by the Board of Zoning Adjustment. Under this new regulation, enacted November 3, 1954, apartment buildings are permitted to operate "commercial adjuncts for the sale of convenience commodities and services, such

"1. We will not, at any time. nor in any manner, advertise our project as a 'hotel'.

"2. We will not, at any time, erect any signs on or about our project designating the building as a 'hotel'.

"3. We will not have any bellboys employed on or about our project.

"4. We will not remove any of the kitchen equipment from the premises.

"5. Rents to be charged for these accommodations will be determined by your office, subject to the review and acceptance or modification by the Rent Administrator for the District of Columbia.

"You may be assured that we will continue to use our best efforts to obtain tenant occupancy on a permanent basis."

5. The text of the reply of the Assistant Commissioner of FHA, to the foregoing letter of defendant is as follows:

"Reference is made to your letter of August 15, 1952, in which you request that this Administration consent to the use of 250 apartments in the above identified projects for transient guests in order that the commercial adjuncts of the projects, as constructed in accordance with approved plans and specifications, may be legally used for commercial purposes in accordance with the requirements of the Board of Zoning Adjustment of the District of Columbia.

"As you know, it is not the policy of this Administration to permit any of the apartments or living units in rental projects covered by insured mortgages to be used for transient guests but in these projects our insurance of the mortgages was predicated in part upon the use of and income from commercial adjuncts.

It is hoped that you may be able to prevail upon the zoning authorities of the District of Columbia to permit the use of such commercial facilities without requiring that any of the apartments be made available for transient guests.

"We have carefully considered the contents of your letter of August 15, and attachments, and previous correspondence relative to use of the commercial facilities in the projects. In view of the fact the zoning authorities of the District of Columbia require the use of 250 apartments for transient guests as a prerequisite to use of the commercial adjuncts of the projects for commercial purposes and in view of approval of the plans and specifications by the Building and Zoning Department of the District of Columbia prior to construction of the projects, we are approving the use of 250 apartments in the projects for transient guests. This approval, however, shall be effective only so long as such transient use is required by the zoning authorities of the District of Columbia as a prerequisite to commercial use of the commercial facilities. This approval is also subject to all of the conditions of your letter of August 15 and to subsequent approval by this Administration of the apartments to be used for transient guests and the rents to be charged therefor.

"With respect to the apartments to be used for transient guests and the rents to be charged therefor, we request that you immediately communicate with Mr. Thomas C. Barringer, our Director for the District of Columbia, and submit to him necessary information and proposals for consideration."

as the tenants' daily living needs in food, drugs, sundries and personal services". However, apartments located "less than one-fourth mile walking distance from the center of the principal entrance of the apartment building to be serviced to the nearest principal business street frontage of any business district previously established and operating in a commercial zone" are not eligible under this new regulation.

22. As soon as the regulation was passed, the defendant filed an appeal known as Appeal No. 4000 with the Board of Zoning Adjustment for permission to operate a grocery store on the premises. A grocery store could not be located in a hotel under the regulations. In preparation for the hearing on Appeal No. 4000, the defendant examined a map prepared by the Board of Zoning Adjustment which indicated a distance of 1335+/— feet, this being the scaled distance from The Woodner to 14th Street, along Spring Place. A draftsman in the office of the Board of Zoning Adjustment, at the defendant's request, drew another line on the map which ran from The Woodner to 14th Street, along Spring Road, and this distance was indicated to be 1545 +/— feet. At the hearing the defendant represented that it qualified under the new regulation, and argued that the Board should find that the walking distance should be along Spring Road rather than Spring Place, since there was no crosswalk at Spring Place and 16th Street for the protection of pedestrians. After consideration, the Board of Zoning Adjustment granted the appeal. However, an order was not issued because defendant requested that its issuance be held up because it was not yet prepared to make the installation.

23. This matter came to the attention of FHA and it was concluded after a study of the regulation that the defendant now could operate all its commercial adjuncts without a hotel license. Plaintiff then requested defendant to make an application for permission to operate its commercial adjuncts under the new zoning regulation.

24. Thereupon, defendant hired an engineer to measure the distance between the principal entrance of the project and 14th Street, and notified FHA and the Board of Zoning Adjustment, that the distance was less than a quarter mile and that therefore, it could not qualify under the new ordinance.

25. Upon receiving this statement, the Board of Zoning Adjustment had its District Surveyor make an official measurement and, the distance was found to be 1324 feet.

26. The plaintiff, by virtue of the defendant's various breaches of contract, declared the agreement to be terminated, and ordered defendant on April 20, 1955 to cease its hotel and transient operations. Defendant refused, and continues to operate as an apartment-hotel.

27. The defendant's failure to notify FHA of the District of Columbia's zoning regulations until such time as the building was largely completed was an act of bad faith, and was calculated to place FHA under pressure to permit transient rentals in violation of FHA policy and practices.

28. The defendant's effort to establish the jurisdiction of the Board of Zoning Adjustment under Appeal No. 4000 was in good faith, but its subsequent attempt to show lack of jurisdiction was not made in good faith, but was motivated entirely by the defendant's financial considerations.

29. Transient accommodations at The Woodner during eight months ending August 31, 1957 had a vacancy ratio of 26.9%. The non-transient accommodations for the same period reflect the vacancy ratio of 5%. There is nothing in the record to establish that the transient accommodations, if converted to non-transient accommodations, would not be fully rented.

30. Under FHA policy the furniture purchased by the defendant can be used in furnished apartments if operated on a non-transient basis. The record does not establish the amount spent by defend-

-ant for furniture now being used in the hotel operation.

31. The instant action was instituted by the Commissioner of FHA on July 11, 1955, following refusal by defendant to -cease its hotel and transient operations as ordered by the Commissioner in his letter of April 20, 1955.

### Conclusions of Law

■ (1) The operation of a hotel is a business other than the operation of a rental housing project.

(2) The defendant's hotel operations are contrary to that provision of its -charter which restricts its business activity to the operation of a rental housing project—so long as FHA insurance on mortgages on its project is outstanding.

■ (3) From the beginning, transient rentals were not within the scope of defendant's permitted activity under its charter except with the consent of FHA since the charter expressly declares that without FHA approval the corporation "shall not * * * require as a condition to the occupancy or leasing of any unit in the project the payment * * * of any amount other than the payment of the first month's rent" plus a specified security deposit "to guarantee the performance of the covenants of the lease." The quoted charter provision contemplates that any rental of a unit in defendant's project shall be for at least one month.

■ (4) Such right as defendant had to conduct transient operations in its project was dependent solely upon the permission given by FHA in the agreement of August 1952 between FHA and defendant.

(5) After the agreement of August 1952 was made it was not thereafter modified by acquiescence of the parties or otherwise.

(6) The contract of August 1952 between defendant and FHA has been substantially breached in that defendant has used bellboys and has advertised as a hotel and the contract is found to have been legally terminated by FHA.

■ (7) The defendant is now eligible under the new zoning regulations to operate the premises involved without a hotel license, and it was implicit in the agreement of August 1952 that in the event of such an amendment, defendant would apply for permission to operate its commercial adjuncts thereunder. The defendant's failure and refusal to apply is not made in good faith and was also a substantial violation of the agreement of August 1952, justifying plaintiff's termination of the contract.[1]

■ (8) The Board of Zoning Adjustment has jurisdiction to consider an appeal by the defendant under the amended zoning regulations.

■ (9) The method employed by the Board of Zoning Adjustment to determine the distance from the principal entrance of The Woodner to the nearest principal business street frontage, to wit, scaling the plat of the area, was reasonable and proper.[2]

(10) The method employed by the Surveyor of the District of Columbia to determine the distance from the principal entrance to the business street frontage was reasonable and proper.

■ (11) The prohibitions against hotel operations and transient rentals in

---

1. 3 Williston on Contracts, Revised Ed., 1936, § 841, p. 2360; Restatement, Contracts, §§ 397, 275, comment a.

2. Ambiguous sections of zoning ordinances should be interpreted according to the intent of the enacting body. Hutchison v. Board of Zoning Appeals, 1953, 140 Conn. 381, 100 A.2d 839. Here the Zoning Commission was clear in its intent to enact a regulation that would include

commercial adjuncts for The Woodner. Moreover, the Board of Zoning Adjustment is created and qualified to decide questions of fact and opinion as to zoning. Unless the Board's decision is clearly arbitrary and unreasonable, courts should not substitute their judgment for the Board's. Selden v. Capitol Hill Southeast Citizens Association, 95 U.S.App.D.C. 62, 219 F.2d 33.

Section 513 were (in effect) included in defendant's charter adopted in 1949, and properly so in view of the purpose of Section 608 of the National Housing Act, as amended in 1946, to provide apartments during an unprecedented emergency shortage of housing and to give preference in the occupancy of the apartments to World War II veterans and their immediate families and to "hardship cases".[3] Section 513 does not, as to defendant, create a new restriction with respect to a past transaction and accordingly, this section is applicable to defendant.[4]

■ (12) Section 513 provides that project owners who had secured written permission to rent to transients prior to May 28, 1954, could continue to rent to transients. However, this provision was intended by Congress to confirm, not to abrogate, existing written agreements between FHA and Section 608 mortgagors, and, interpreting the section in accordance with the declared legislative intent, it did not liquidate the agreement then in effect between FHA and defendant.[5]

■ (13) There are no equities in favor of the defendant which commend themselves to the conclusion of this Court, it appearing that defendant engaged in a pattern of conduct which was calculated to defeat the purposes of the National Housing Act.

(14) An injunction against use of defendant's premises for transient and hotel purposes shall issue. Counsel for plaintiff will submit a proposed decree with provision for an appropriate stay in case of the timely filing of a notice of appeal, and also with provision for a reasonable period of transition from transient to residence use of the apartments involved.

3. 60 Stat. 214. And see House Report No. 1580, U.S.Code Congressional Service, 79th Congress, 2d session, 1946, p. 1177.

4. Section 513, with certain exceptions, directs enforcement of its prohibitions against hotel and transient use "as to all existing multifamily housing with respect to which a mortgage was insured under this Act prior to August 2, 1954, as well as to all multifamily housing with respect to which a mortgage is hereafter insured under this Act." In Darlington, Inc., v. Federal Housing Administration, D.C., 142 F.Supp. 341; D.C., 154 F.

Supp. 411, the court having found that neither the plaintiff's charter nor the law existing prior to 1954 prohibited rental to transients, declined to apply Section 513 retroactively.

5. Sections of statutes should not be interpreted literally if the result would be plainly at variance with the legislative intent as a whole. United States v. American Trucking Associations, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345, rehearing denied 311 U.S. 724, 61 S.Ct. 53, 85 L.Ed. 472.